CONSUMERS POWER COMPANY v BIG PRAIRIE TOWNSHIP

1. TAXATION—GENERAL PROPERTY TAX ACT—WORDS AND PHRASES—
TRUE CASH VALUE—ASSESSMENT.

The definition of "true cash value" supplied by the general
property tax law, which is "the usual selling price at the place
where the property to which the term is applied shall be at the
time of assessment, being the price which could be obtained for
the property at private sale, and not at forced or auction sale",
is not the exclusive test for determining the value of property
for tax purposes (MCLA 211.27; MSA 7.27).

2. TAXATION—ASSESSMENT—TRUE CASH VALUE—DETERMINATION OF
TRUE CASH VALUE—METHODS.

There are five possible tests for determining the true cash value
of property for tax assessing purposes: (1) actual cash value
determined by the current selling price of the property or
similar properties at private sale after negotiation, (2) adjusted
reproduction cost method, (3) capitalization of income method,
(4) depreciated net cost (book value), and (5) a comparison
method, involving a determination of the depreciated recon-
struction cost of equivalent building and facilities; it is the duty
of the Tax Tribunal to adopt that method which is most
appropriate to the individual case as the particular facts may
indicate.

3. TAXATION—ASSESSMENT—DETERMINATION OF CASH VALUE—DIS-
CRIMINATION.

Courts will not interfere with the assessment of property for

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4] 72 Am Jur 2d, State and Local Taxation §§ 753, 754, 759.
[3] 72 Am Jur 2d, State and Local Taxation § 787.
[5] 72 Am Jur 2d, State and Local Taxation §§ 765, 766.
[6] 31 Am Jur 2d, Expert and Opinion Evidence §§ 140, 141.
[7] 64 Am Jur 2d, Public Utilities § 301.
[8] 64 Am Jur 2d, Public Utilities § 148.
[9] 72 Am Jur 2d, State and Local Taxation §§ 761, 762.
[10] 71 Am Jur 2d, State and Local Taxation § 441.
[11] 72 Am Jur 2d, State and Local Taxation § 819.

taxation by assessing officers, or the Tax Tribunal on appeal, where it appears that any of the acceptable methods has been used for the determination of cash value and there is absent a showing of an unfair result or discrimination.

4. TAXATION—ASSESSMENT—TRUE CASH VALUE—DETERMINATION OF TRUE CASH VALUE—METHODS—WEIGHING PROCESS.

A tax assessing authority in performing an assessment might conceivably utilize any one of the five accepted methods for arriving at true cash value, however, the Tax Tribunal must weigh each method in determining the true cash value of the subject property, although it is impermissible to make the assessment through an averaging process in which all methods are utilized; the weighing process involves comparing the values determined by the application of each of the five methods and seeing which of the values so determined, in light of the assessor's experience and reasoned judgment, best approximates the cash value of the property.

5. TAXATION—ASSESSMENT—TRUE CASH VALUE—TAX TRIBUNAL—HYDROELECTRIC FACILITY—DEPRECIATED RECONSTRUCTION COST.

The Tax Tribunal's decision that adjusted depreciated reconstruction cost is the most appropriate method for determining the value of a dam utilized by a specific hydroelectric generating station owned by a public utility company was proper where the decision reflects a proper weighing of the various acceptable methods for arriving at true cash value.

6. WITNESSES—EXPERT WITNESSES—HYDROELECTRIC FACILITY—TRUE CASH VALUE—WEIGHT GIVEN TO TESTIMONY—COMPETENCE OF TESTIMONY.

The fact that an expert witness testifying as to the true cash value of a hydroelectric plant had not previously appraised a hydroelectric plant goes only to the weight to be given to his testimony, not its competence, where the expert was otherwise qualified to make such an assessment.

7. TAXATION—ASSESSMENT—HYDROELECTRIC FACILITY—LICENSES—FEDERAL POWER COMMISSION—TAX TRIBUNAL.

The Tax Tribunal's decision in an action to determine the true cash value of a hydroelectric generating facility to totally discount the possibility that the Federal Power Commission would take over the facility without compensation upon the expiration of the current license granted by the FPC was not clearly erroneous where the predominance of factors suggests the improbability of a takeover.

8. Taxation—Assessment—True Cash Value—Tax Tribunal—Hy-
droelectric Facility—Uplands—Recreational Facilities.

The Tax Tribunal in an action to determine the true cash value
of a hydroelectric generating facility, including the real prop-
erty within the entire project, erred in determining the value of
certain uplands as having a market value by failing to take
account of the effect of the inclusion of all the project uplands
within a recreational use plan approved by the Federal Power
Commission where no reasonable possibility was demonstrated
that the government restriction on the use of the property will
be changed.

9. Taxation—Assessment—Real Property—Utility Company—Ac-
tual Income—Historical Cost—Governmental Regulation.

Actual income that may be derived from certain land owned by a
utility company must be considered for determining the value
of the land for tax assessment purposes where the company's
ability to allow others to use the land is greatly restricted by
governmental regulation; although land does not depreciate, its
value may be significantly impaired by governmental regula-
tion.

10. Taxation—Assessment—Utility Company—Real Property—
Nominal Value—Federal Power Commission.

A nominal value, for tax assessment purposes, should be assigned
to land owned by a utility company where neither income nor
return of investment can be realized therefrom unless the
Federal Power Commission exercises its takeover rights, in
which case it would have to pay historical cost at a maximum,
and where the predominance of factors suggests the improbabil-
ity of the takeover.

11. Taxation—Statutes—Tax Tribunal Cost—Tax Tribunal—Ju-
risdiction—State Tax Commission—Assessments.

The Legislature, in enacting the Tax Tribunal Act, which created
the Tax Tribunal and gave the Tribunal jurisdiction over tax
issues which previously could be raised either before the State
Tax Commission or in circuit court, intended that the Tax
Tribunal would retain all of the jurisdiction formerly exercised
over property tax decisions made by the STC, including the
increasing of assessments (MCLA 205.701 et seq.; MSA 7.650[1]
et seq.).

Appeal from the Michigan Tax Tribunal. Sub-

mitted December 7, 1977, at Lansing. (Docket Nos. 30608–30610.) Decided February 6, 1978. Leave to appeal applied for.

Petitions by Consumers Power Company to the State Tax Commission and the Tax Tribunal for a review of assessments by Big Prairie Township of certain real property and hydroelectric facilities for the years 1973, 1974, and 1975. Newaygo County was allowed to intervene as a respondent in the Tax Tribunal. Judgment for respondents. Petitioners appeal. Affirmed in part, reversed in part, and remanded to the Tax Tribunal.

*Robert J. Byers; Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Eugene A. Gargaro, Jr.); Jack C. Radcliffe, Jr.;* and *Fraser, Trebilcock, Davis & Foster* (by *James A. Park)* for petitioner.

*Miller, Canfield, Paddock & Stone* (by *Samuel J. McKim III* and *James W. Goss),* and *Terrence R. Thomas,* Newaygo County Prosecuting Attorney, for respondents.

Before: R. B. Burns, P. J., and Allen and R. M. Maher, JJ.

Allen, J. Consumers Power Company appeals of right from an opinion and judgment entered September 30, 1976, by the Michigan Tax Tribunal, assessing the Hardy Dam, a hydroelectric generating station owned by Consumers, and the lands appurtenant thereto for the years 1973, 1974 and 1975.[1]

Despite the bulk of the record and pleadings,

---

[1] It appears a protest was also filed by Consumers for the tax year 1976 and will likewise be filed for 1977 unless this appeal is first resolved, although the facts and issues relating to the proper assessment for any of these years are, as to the legal principles involved, identical.

conceptually, this is not a difficult case. But within the conceptual framework, two issues of first impression are raised; (1) what is the proper method by which to determine the "true cash value" of a hydroelectric facility, and (2) may the Tax Tribunal adopt an assessed valuation greater than that set by the assessing authority and confirmed by the board of review.

## BACKGROUND AND HISTORY

### The dam

Construction of the Hardy Dam commenced in 1928, and was completed in 1930, and its 32.5 megawatt generating capacity was placed on line in 1931. Although the Federal Power Act, 16 USC 791a *et seq.,* requiring a license for the construction of any dam on a navigable waterway, had been in effect since June 10, 1920, Consumers Power Company did not have a Federal Power Commission license authorizing it to undertake this project.

As time passed, the FPC brought more and more unlicensed projects within its regulatory framework. *United States v Appalachian Electric Power Co,* 23 F Supp 83 (WD Va, 1938), *reversed on other grounds,* 311 US 377; 61 S Ct 291; 85 L Ed 243 (1940), *rehearing denied,* 312 US 712; 61 S Ct 548; 85 L Ed 1143 (1941), *petition denied,* 317 US 594; 63 S Ct 67; 87 L Ed 487 (1942). Accordingly, in 1962, Consumers Power Company applied for and was granted a license by the FPC for another 31 years of operation, and its current license for the Hardy Dam therefore expires in 1993. The FPC has authority to issue licenses for any period not to exceed 50 years. 16 USC 799.

Until 1973, the tax assessing authorities did not

dispute Consumers' method of evaluating the true cash value of Hardy Dam and appurtenant properties by depreciating the dam and other buildings over a 31 year useful life matching that of the FPC license granted. The land, considered not depreciable, was simply carried forward on Consumers' books at original cost. The original cost of the entire project was something over $11,000,000. By 1973, the "book value" of the dam and appurtenant land was down to $3,276,136.

However, in 1973 the Yom Kippur War between Israel and her Arab neighbors led to huge increases in fossil fuel prices, particularly for natural gas and petroleum products. It is alleged by the taxing authorities that as a result of the jump in fossil fuel prices the value of Hardy Dam underwent a sudden upward shift. With fuel prices having run amok, the efficiency of hydroelectric generators vis-a-vis equivalent fossil fuel peaking stations became striking.[2] Because of this disparity, since 1973 the assessing authorities have taken the position that Hardy Dam's increased cost efficiency makes the project far more valuable than it was previously. Consumers has disputed this assessment on the grounds that historical depreciated cost is the sole basis on which it is allowed to earn a return by the FPC and Michigan

[2] For example, in 1974 Hardy Dam produced, exclusive of plant use, 109,131,000 kilowatt hours of saleable electricity, at an average cost of .79 mills per kilowatt hour. In comparison, Consumers' Morrow Plant, a gas turbine generating station constructed in 1969, with a 35 megawatt rated capacity, generated 92,436,000 kilowatt peak hours of electricity at an average cost of 21.53 mills per kilowatt hour, while the contemporaneously constructed Straits gas turbine station, with a rated capacity of 25 megawatts, generated 90,000,025 kilowatt peak hours of electricity at an average cost of 16.26 mills per net kilowatt hour generated. Thus, while Consumers spent $1,990,241 to produce 92,000,000 kilowatt hours of saleable electricity at its Morrow Plant, and $1,464,142 to generate 90,000,000 saleable kilowatt hours at the Straits Plant, it spent only $86,213.49 at the Hardy Dam to produce 109,000,000 kilowatt hours of peak hour electricity.

Public Service Commission (MPSC), Consumers having been allowed a 7.47% rate of return for 1973 and 1974 by the MPSC, and 7.53% for the following two years. That is the crux of this litigation in a nutshell.

Rather than adopt depreciated historical cost, the taxing authorities have opted instead to use an evaluation method known as adjusted depreciated reconstruction cost. This involves calculating what it would cost to rebuild an equivalent hydroelectric facility at current construction prices, then allowing depreciation to reflect the fact that, as of 1973, Hardy Dam was 42 years old. This method was adopted and approved by the Tax Tribunal as applicable to this case. The witnesses on both sides agreed that the manner in which the depreciated reconstruction cost method is applied is through use of the Handy-Whitman Index, a publication, based on elaborate historical cost information and calculations, which allows the user to calculate present construction costs based on historical construction costs, and then to apply appropriate depreciation multipliers. To or from this figure may then be added or substracted appropriate amounts for various kinds of obsolescence (functional, historical and economic) and other factors, independent of construction costs, which affect the value of the property for ad valorem taxation purposes.

### The appurtenant lands

Also in dispute is the value of the lands owned by Consumers and surrounding the Hardy Dam reservoir. The total land involved consists of 5,500 acres more or less, of which 2,250 are submerged, 2,210 are uplands within the project boundary and 1,040 are uplands outside the project boundary.

All the land is located within the confines of the Manistee National Forest.

Pursuant to FPC regulations, in conjunction with its license application, Consumers included an Exhibit R, a recreational use plan for all lands within the project boundary. FPC regulations generally require that a licensee include within the project boundary all land within 200 feet of the high water mark. In terms of nonsubmerged land, this requirement would subsume at most 381 acres of land. However, the recreational use plan submitted by Consumers and approved by the FPC includes far more land, Consumers having set aside some 780 acres for recreational development (of which 450 have been developed), such as for cabins, docks, county and township parks, club houses, etc., and the remaining 1,430 acres of land as a tree plantation. In disputing its property tax assessment as regards the land, Consumers argues that little value above historical cost can be placed thereon because the land cannot be leased or sold without FPC permission, and based on a sample consisting of all property transfer requests acted upon by the FPC in a one year time span, the chances that any land could be released for more intensive uses by private or public persons or agencies is nearly zero, and the land is so saddled with regulatory restrictions as to be of little market value.

The Tax Tribunal felt that Consumers had included within the project boundary more land than necessary for the attributed purpose of increasing its capital base for rate-making purposes, and the Tribunal held that a taxpayer could not be allowed to voluntarily restrict the uses to which its property could be put so as to decrease its liability for property taxes. *NeBoShone Associa-*

*tion, Inc v State Tax Commission,* 58 Mich App
324; 227 NW2d 358 (1975). The Tax Tribunal
resolved to assess the nonsubmerged lands within
the project at 50% of the value of similar land
open to unrestricted use, or $500 per acre.

### Proceedings

For 1973 and 1974, Consumers' appeal was ad-
dressed to the State Tax Commission, but in 1975,
pursuant to the provisions of the Tax Tribunal
Act, MCLA 205.701 *et seq.;* MSA 7.650(1) *et seq.,*
the matter was transferred to the Tax Tribunal.
The 1975 appeal was filed with the Tax Tribunal.
In rendering its judgment, the Tax Tribunal as-
sessed the subject property at a higher value than
that originally set by the township and approved
by the county board of review. Big Prairie Town-
ship had originally assessed the property for all
three tax years in question at an assessed value of
$5,669,100 (one-half of true cash value reduced by
the appropriate equalization factor). Once the mat-
ter was before the Tax Tribunal, however, Ne-
waygo County petitioned to intervene and permis-
sion to do so was granted. The county then sought
to assess the property at $12,000,000 for each of
the three tax years. Ultimately, the Tax Tribunal
adopted an assessed value of $8,190,637 for 1973,
$8,483,332 for 1974, and $9,315,574 for 1975. Not
surprisingly, Consumers feels aggrieved at having
ended up 2-1/2 to 3-1/2 million dollars of assessed
value worse off than it was before it undertook
this expansive litigation. Three basic issues are
presented:

> I.    *Did the Tax Tribunal err in utilizing
>       the adjusted depreciated reconstruction*

cost method in assessing the hydroelectric generating facility itself?

II.   Did the Tax Tribunal err in its assessment of the real estate involved, considered separately from the assessment of the generating facility?

III.   Did the Tax Tribunal exceed its jurisdiction in adopting an assessed valuation greater than that originally set by appellee Big Prairie Township and confirmed by the board of review?

ASSESSMENT OF THE HYDROELECTRIC FACILITY
(ISSUE I)

It was the duty of the Tax Tribunal, as the Legislature's designated agent for that purpose, to determine the true cash value of Hardy Dam and appurtenant property, following which it was bound to apply ministerially the requisite equalization factor. Const 1963, art 9, § 3; see also art 9, § 5. Although the legislatively supplied definition of "true cash value" is "the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale", MCLA 211.27; MSA 7.27, the legislative test has been held not to be exclusive. For example, evidence of actual sales price at a private sale, following an arm's length transaction, has been held not binding on the State Tax Commission in determining the true cash value of certain property, which, by virtue of its unique economic use, has no ready market. *Cleveland-Cliffs Iron Co v Republic Twp,* 196 Mich 189; 163 NW 90 (1917). Where the prop-

erty is, by size and potential use, unusual, different assessing methods must be applied, involving the application of experienced and reasoned judgment to the evaluation process. Thus, the Tax Tribunal correctly rejected Consumers' arguments as to what other public utility companies might pay, have paid, would pay, or would consider paying for a generating station property whose value is affected by the authorized rate of return set by the Public Service Commission.

This Court has identified three acceptable tests for determining true cash value:

"It is the opinion of this Court until the legislature establishes other methods for determining true cash value, three acceptable tests have been and are recognized for such determination, namely: actual cash value determined by current selling price of the property or similar properties at private sale after negotiation; adjusted reproduction cost method; and capitalization of income method." *Pantlind Hotel Co v State Tax Commission,* 3 Mich App 170, 176; 141 NW2d 699 (1966), *aff'd,* 380 Mich 390; 157 NW2d 293 (1968). Accord, *Alger-Delta Co-operative Electric Association v Bay De Noc Twp,* 13 Mich App 41; 163 NW2d 714 (1968).

Two other possibilities should also be noted:

(4) Depreciated net cost (book value), the approach advocated by Consumers Power Company; and

(5) A comparison method, involving a determination of the depreciated reconstruction cost of equivalent alternate power stations (fossil or nuclear fuel).

The choice of which method to use is by no means unfettered; it is the duty of the Tax Tribunal to adopt that method which is most appropriate to the individual case as the particular facts may indicate.

"Which method is most appropriate in an individual case is to be determined by the assessing officer or State tax commission on appeal, from the facts of that case and absent a showing of unfair result or discrimination, courts will not interfere with that judgment." *Pantlind Hotel v State Tax Commission, supra,* at 176.

It is an overriding principle that, no matter the seeming appropriateness of the method adopted, the result must be checked for unfairness or discrimination, a rule which appears to have motivated the Tax Tribunal in its comments purportedly indicating that equitable considerations underlie its decision. Whether right or wrong in its views thus expressed, the Tax Tribunal nonetheless properly considered the fairness of the method for which it opted, and in so doing did not violate the rule that the operation of a tax law is not a proper subject for equitable consideration. *Cf. Thoman v City of Lansing,* 315 Mich 566; 24 NW2d 213 (1946), *Consumers Power Co v County of Muskegon,* 346 Mich 243, 247; 78 NW2d 223 (1956), *Langford v Auditor General,* 325 Mich 585; 39 NW2d 82 (1949).

In performing an assessment, the assessing authority might conceivably utilize any one of the five enumerated methods. While it is impermissible to make the assessment through an averaging process in which all methods are utilized, it is agreed by the parties that the Tax Tribunal must weigh each method in determining the true cash value of the subject property. The weighing process involves comparing the values determined by the application of each of the five methods and seeing which of the values so determined, in light of the assessor's experience and reasoned judgment, best approximates the cash value of the property on a cosmic scale of truth. *Seriatim,* we

now weigh the respective merits of the five valuation methods.

1. *Depreciated Net Cost Method.* This method, so vigorously propounded by Consumers, cannot be reasonably applied. In 1974 (the only year for which a copy of Consumers' annual report to the FPC is available), Hardy Dam generated some 109,000,000 kilowatt hours (kwh) of electricity, exclusive of plant use, at a cost of $86,213.49. The average sales price of one kwh was $.0256094. Thus, Hardy Dam produced net income of $2.7 million.

Alternatively, Consumers paid an average of two cents per kwh for electricity it purchased from other utilities. Without Hardy Dam, Consumers' expenses would have been $2.2 million higher. A facility with a remaining useful life of not less than 20 years, which produces annual income of $2.7 million while saving $2.2 million in expenses must be worth more than its "book value" of $3.4 million.

Consumers argues that income cannot be attributed to Hardy Dam in this fashion, because the PSC added the depreciated net cost of Hardy Dam to the depreciated net cost of the remainder of Consumers' generating facilities and multiplied by 7.47% to determine Consumers' allowed profit for 1974. By complex accounting procedures the PSC set rates by adding permitted profits to anticipated expenses. If Hardy Dam is viewed as producing a $2.7 million profit, Consumers argues, some other facility must show a corresponding loss, since the income "pie" to be divided contains only so many slices.

This argument underlines the importance of Consumers' insistent suggestion that another public utility, contemplating purchasing the dam,

would pay no more than Consumers' depreciated net cost because that is the basis on which the buyer would be allowed to earn a profit by the regulatory agencies involved. Much argument and evidence dealt with whether the PSC or FPC would permit a potential buyer to include more than depreciated net cost in its rate base if a higher sales price were agreed upon. It may be assumed that a regulated utility would probably not pay significantly more than depreciated net cost for Hardy Dam, since due to the effect of regulation a utility has little direct economic stake in reducing its expenses per electric unit sold, while it is vitally interested in having the highest possible capital base against which to apply its permitted profit margin. But aside from regulated public utilities, there are two categories of potential buyers for an electric generating facility: municipal power companies, whose rates are generally not regulated by either the PSC or FPC, and large industrial concerns with high electric power demands. To such a prospective buyer, depreciated net cost is irrelevant. What is relevant is remaining useful life and potential income or savings after expenses, and the maximum price such a buyer would pay for Hardy Dam can be better determined by the capitalization of income method.

2. *Capitalization of Income Method.* This requires determining the present value of the amount of income the facility is expected to generate over its remaining useful life. This is somewhat complicated by the fact that while the actual mechanical generator may have a useful life of only 100 years or less and the present FPC license expires in 1993, the remaining parts of the dam have an essentially infinite life, and the mechani-

cal generator could be replaced at a fraction of the cost of building an entirely new dam. Nevertheless, given the figures involved, it is enough to estimate the remaining useful life of Hardy Dam in terms of the remaining life of Consumers' FPC license, or 20 years. Present value is calculated from the following formula:

$$P = \frac{R_1}{(1 + i_1)^1} + \frac{R_2}{(1 + i_2)^2} + \; * \; * \; * \; + \frac{R_n}{(1 + i_n)^n}$$

See 1 Encylopedia Britannica (1970 ed), Annuity, p 1010.

In this formula, i is the discount factor, n is the number of years for which income will be produced, and $R_n$ is the income to be generated in the year n. Assuming that i approximates the 1973–74 rate of return (7.47%), that R remains constant (it is more likely to increase), that R is based on $.0256094 average selling price per kilowatt hour, average generation of 109,131,000 kilowatt hours, and expenses of $86,213.49, Hardy Dam has a capitalized value in excess of $27,000,000. This figure is higher than the depreciated reconstruction cost figure adopted by the Tax Tribunal.

Even though, in terms of the income it could generate for a municipal power system or the expenses it could save an industrial user of electricity, Hardy Dam is worth more than its depreciated reconstruction cost, it is highly unlikely that a buyer could be found willing to pay more than that latter value, since in theory the potential buyer could build its own dam. This is another example of what it means to "weigh but not average" the methods of valuation vis-a-vis one another. In weighing the capitalization of income approach, however, it must be recognized that

depreciated reconstruction cost does not represent the full value of the dam, because the owner of the dam enjoys a lawful monopoly and there may be no other place to build an equivalent dam, or permission from the Federal Power Commission to do so may not be forthcoming.

3. *Actual Selling Price.* In the instant case this method has been shown to be of no relevance, and no party has urged that such a value can be determined.

4. *Adjusted Depreciated Reconstruction Cost.* This method is described *supra.*

5. *Comparative Depreciated Reconstruction Cost.* The assessment value as determined by the reconstruction cost method may, however, be limited by the fifth valuation method, which is that of comparing the depreciated reconstruction cost of Hardy Dam with the depreciated reconstruction cost of an equivalent alternate power source with a similar remaining useful life. Although it is far more expensive per kilowatt of installed capacity to build a dam as compared to a fossil fuel plant—and perhaps even as compared to a nuclear plant—expenses for operational purposes gradually consume the capital expenditure savings. We again note that, to a regulated public utility, the high costs of operation merit little consideration because the regulatory authority will allow the utility to recapture all its expenditures for such purposes. However, to a nonregulated user, such as a municipal power system or industrial user, expenses are quite relevant because they come right out of that user's pocket. Thus, the fact that Consumers Power Company's Straits facility was built in 1969 at a cost of $1,911,044 does not make it an acceptable substitute for Hardy Dam, because the Straits facility's expenses of operation in

1974 were $1,464,142. With fuel costs increasing, the overall 20-year cost of the Straits facility will far exceed the depreciated reconstruction cost of Hardy Dam, and every year beyond 1993 the dam operates is a bonus to its owner.

Comparing the valuation of the dam, as determined by the five methods, this Court concludes that the Tax Tribunal's decision that adjusted depreciated reconstruction cost is the most appropriate method for determining the value of Hardy Dam reflects a proper weighing of the various methods. *Parsons v Detroit & Canada Tunnel Co,* 15 F Supp 986 (ED Mich, 1936), *CAF Investment Co v State Tax Commission,* 392 Mich 442; 221 NW2d 588 (1974). By comparing the assessment value determined by the capitalization method with that resulting from the adjusted depreciated reconstruction cost method, it is seen that Hardy Dam does not suffer from any "economic obsolescence" nor for that matter from any functional obsolescence. As fuel costs continue to predictably increase, Hardy Dam will continue to appreciate in value rather than depreciate.

Likewise, the evidence offered by Consumers Power Company concerning whether the dam would be reconstructed by Consumers if it were damaged or destroyed may be rejected as irrelevant. A single witness testified that Consumers would not rebuild Hardy Dam if it did not exist today or if it were damaged or destroyed. That may be true, because to a regulated utility little weight may be placed on expenses of operation in considering what facilities to construct for power generation. But the argument ignores the true economic value of Hardy Dam to an unregulated utility or an ultimate user of electricity as to whom it achieves its maximum economic benefit.

To such a potential owner, whether the dam would in fact be reconstructed is a function of simple economics. So long as reconstruction cost is less than capitalized income it would be worthwhile to repair or rebuild the dam, unless some alternate power source could supply the missing electricity at lower total cost over its lifetime, which is not possible given present production expense parameters.

So far, our analysis has been economic in nature. Let us turn now to the law. Decisions from other jurisdictions almost unanimously support our economic conclusion that the adjusted depreciated reproduction cost method is the most appropriate method for determining the value of hydroelectric projects. *Public Service Co of New Hampshire v New Hampton,* 101 NH 142; 136 A2d 591 (1957), *Alfred J. Sweet, Inc v City of Auburn,* 134 Me 28; 180 A 803; 104 ALR 784 (1935), *New Haven Water Co v Board of Tax Review of the City of New Haven,* 166 Conn 232; 348 A2d 641 (1974), *Boston Gas Co v Assessors of Boston,* 334 Mass 549; 137 NE2d 462 (1956), *Maine Consolidated Power Co v Town of Farmington,* 219 A2d 748 (Maine, 1966), *People ex rel Lehigh Valley R Co v Harris,* 168 Misc 685; 6 NY2d 794 (1938), *aff'd,* 281 NY 786; 24 NE2d 476 (1939), *Independent School District No 99 v Commissioner of Taxation,* 297 Minn 378; 211 NW2d 886 (1973). In so holding, those Courts have recognized that the value of property for ad valorem tax purposes and its value for ratemaking purposes "have been uniformally recognized as different". *Kittery Electric Light Co v Assessors of the Town of Kittery,* 219 A2d 728 (Maine, 1966), *Public Service Co v New Hampton, supra, Town of Barnet v New England Power Co,* 130 Vt 407; 296 A2d 228 (1972), *Northwest Light &*

*Water Co v Alexander,* 29 Idaho 557; 160 P 1106 (1916), *Missouri Rate Cases,* 230 US 474; 33 S Ct 975; 57 L Ed 1571 (1913), *Willcox v Consolidated Gas Co,* 212 US 19; 29 S Ct 192; 53 L Ed 382 (1909). Contra, *Spokane & Inland Empire Co v Spokane County,* 75 Wash 72; 134 P 688 (1913) (based on peculiar statute, legislatively overruled).

The Newaygo County Equalization Director, Mr. Johnson, was the only witness who gave a dollar value as calculated by the adjusted depreciated reproduction cost method, and his testimony was given over vigorous objection by Consumers. The grounds for the objection were (1) that there was no evidence that Mr. Johnson considered, prior to application of the reproduction cost method of appraisal, whether or not the dam would be reconstructed if it were destroyed, damaged, or rendered inoperable, and (2) that Mr. Johnson was not qualified to make the appraisal because he had never previously appraised a hydroelectric project.

As to the first objection, we have already noted that whether or not Consumers would choose to reconstruct or reproduce the Hardy Dam is immaterial, provided that a potential user can be identified for whom reconstruction would be an economically viable undertaking. As to Johnson's qualifications as an expert witness, Johnson testified he was certified at assessor level III by the State Tax Commission, a certification representing a high level of experience. Although Johnson had never previously appraised a hydroelectric dam, he testified that prior to making his appraisal he consulted with appellees' other expert witnesses and familiarized himself thereby with the use of the Handy-Whitman Index, and further that he studied a number of publications written for the purpose of providing guidance to assessors. It seems

obvious that, at some point, every expert does something within his field for the first time. An expert is qualified as such either through experience, such as by having made numerous prior appraisals of hydroelectric projects, or through generalized training and experience plus specialized study warranting branching out into a new but related area, a category into which Mr. Johnson fits. The fact Johnson had not previously appraised a hydoelectric project goes only to the weight to be given his testimony, not to its competence.

Consumers next claims that the Tribunal's evaluation of Hardy Dam is excessive by reason of the Tribunal's failure to sufficiently consider the negative impact of the possibility of a Federal takeover because the Hardy Dam lies astraddle a navigable water course. 16 USC 807(a) provides, in pertinent part:

"Upon not less than two years notice in writing from the Commission the United States shall have the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project * * * covered in whole or in part by the license, or the right to take over upon mutual agreement with the licensee all property owned and held by the licensee then valuable and serviceable in development, transmission, or distribution of power and which is then dependent for its usefulness upon the continuance of the license * * * upon the condition that before taking possession it shall pay the net investment of the licensee in the project or projects taken, not to exceed the fair value of the property taken, plus such reasonable damages, if any, to property of the licensee valuable, serviceable, and dependent as above set forth but not taken, as may be caused by the severance therefrom of property taken, and shall assume all contracts entered into by the licensee with the approval of the Commission. The net investment of the licensee in the

project or projects so taken and the amount of such severance damages, if any, shall be determined by the Commission after notice and opportunity for hearing. Such net investment shall not include or be affected by the value of any lands, rights-of-way, or other property of the United States licensed by the Commission under this chapter, by the license or by good will, going value, or prospective revenues; nor shall the value as allowed for water rights, rights-of-way, lands, or interest in lands be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee: *Provided,* that the right of the United States or any State or municipality to take over, maintain, and operate any project licensed under this chapter at any time by condemnation proceedings upon payment of just compensation is expressly reserved."

Consumers maintains that the FPC takeover rights must be considered in appraising the dam project and a reduction in appraised value must result, although Consumers concedes that to some extent the amount of reduction to be attributed to the takeover rights is within the discretion of the Tax Tribunal. Consumers charges, however, that the Tax Tribunal essentially ignored the effect of the FPC takeover rights in establishing true cash value of the Hardy Dam project.

Indeed, the Tax Tribunal, placing the burden of proof on Consumers, found no evidence that takeover is more than a mere possibility, speculative at best, and therefore "unworthy of substantive consideration in these proceedings". In so holding, the Tax Tribunal relied on *Nantahala Power & Light Co v Federal Power Commission,* 384 F2d 200, 212 (CA 4, 1967), where the Court held:

"There is absolutely no basis for a reasoned prediction that the Commission will attempt to invoke the recapture provisions upon expiration of the licenses to be issued for these seven developments. Neither can one

predict with any measure of assurance that if recapture is sought, the fair value at the time of recapture will exceed the net investment. Also * * * the developments may thereby become subject to what even Nantahala acknowledges as the government's limited right of recapture at less than fair value. Thus, not only the possibility of recapture, but the possibility of recapture upon terms raising Fifth Amendment questions, is so speculative that the constitutional question is obviously not ripe for decision."

We recognize that a constitutional question is "ripening", by virtue of the FPC's current refusal to renew expired licenses for longer than a few years at a time, while it formulates a policy concerning the exercise of takeover rights. See *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v Federal Power Commission,* 166 US App DC 245; 510 F2d 198, 200 (1975). In light of the FPC's status as Congress' designated agent for control of navigable waters, see *Gibbons v Ogden,* 22 US (9 Wheat) 1; 6 L Ed 23 (1824), *Willson v The Black Bird Creek Marsh Co,* 27 US (2 Pet) 245; 7 L Ed 412 (1829), a court squarely faced with the constitutional issue might well find no uncompensated taking of property in the event of a takeover. The FPC could undeniably, upon expiration of a license, refuse to renew the dam owner's permission to convert the stored potential energy of the restrained waters into electricity, or direct the owner to remove its obstruction to the flow of the navigable waters, since the licensee could claim no vested right to use of the water for any purpose. *United States v Appalachian Electric Power Co,* 311 US 377; 61 S Ct 291; 85 L Ed 243 (1940).

Nonetheless, takeover remains highly improbable. None has ever occurred. The FPC has never initiated takeover proceedings. And takeover can only be accomplished through Congressional, not

administrative, action—the FPC merely makes recommendations to the national legislature. 16 USC 800(a), 807(b). Exercise of the takeover rights is thus contingent on the concurrence of the President and a majority of both Houses of Congress, or on Congressional override of a Presidential veto.

Because the Tax Tribunal could not assign a percentage probability to Federal takeover without picking a number out of thin air (which this Court would inevitably have to reject as unsupported by competent, material, or substantial evidence on the whole record) it had to choose, in effect, between treating takeover as either 0% or 100% probable. Given the predominance of factors suggesting the improbability of a takeover, the Tribunal's decision to discount the possibility cannot be deemed clearly erroneous. This method avoids arbitrary assignment of probabilities and adequately protects Consumers' interests.

Consequently, the judgment of the Tax Tribunal, insofar as it establishes the true cash value of the generating facility itself, should be affirmed, while recognizing that if economic conditions affecting the power generation industry undergo material change a new appraisal will have to be made in accordance with the foregoing principles.

### ASSESSMENT OF THE APPURTENANT LANDS
### (ISSUE II)

The Tax Tribunal chose to appraise the overall project by valuing the dam and other structures separately from the real estate involved. The total land involved consists of approximately 5,500 acres located entirely within Newaygo County and Big Prairie Township. Of this acreage, some 1,040 acres lie without the boundary of the project as defined by the FPC license, while of the lands

within the project, 2,250 acres are submerged and 2,210 are uplands or dry lands. The land is registered in 39 separate parcels, each identified with the prefix "BP" followed by the parcel number. Two of these parcels, BP-357 and BP-367, are the site of the dam and all related improvements.

## The dam site

For the three assessment years in question, the Tax Tribunal fixed a true cash value in the aggregate of $1,744,446 for the land. Parcels BP-357 and BP-367 were assessed at $1,000 per acre, for an actual dollar total of $34,522. Since these parcels are the site of a valuable income producing improvement, and as the adjusted reproduction cost value of the dam itself added to the appraised value of the dam site real estate does not exceed the capitalized value of the dam, the Tax Tribunal's evaluation must be upheld.

## Submerged lands

With respect to the submerged lands, the Tax Tribunal adopted an assessed value of $25 per acre, an essentially nominal sum. As this is substantially less than historical cost, appellant has raised no objection thereto.

## Uplands

Concerning the remaining lands, both within and without the project boundary, the Tax Tribunal judged that such prime waterfront property, and even that not fronting on Hardy Pond, by virtue of its right of access to the pond, would, if unencumbered with any restrictions whatsoever, be worth $1,000 per acre. The Tribunal rejected Consumers' argument that because all the dry

land within the project boundaries is included in
the FPC approved recreational use map and sub-
ject to FPC restrictions, it has no value beyond
historical value because unusable for any purpose.
The Tribunal simply estimated that restrictions
which would be required following any sale by
Consumers to private purchasers would reduce the
value of the land by 50%, and accordingly assessed
such lands at $500 per acre. The Tax Tribunal did
acknowledge that the land within 200 feet of the
high water mark, comprising only some 300 to 400
acres, plus that specifically set aside for recrea-
tional use (total 780), would have to be given a
lesser value, based upon its income producing
value (Consumers leases 450 of these 780 acres
specifically reserved for recreational uses).

### Uplands within the project boundary

Restrictive provisions, pursuant to the mandate
of 16 USC 803(a), are included within Articles 19
and 20 of Consumers' license:

"*Article 19.* So far as is consistent with proper opera-
tion of the project, the Licensee shall allow the public
free access, to a reasonable extent, to project waters
and adjacent project lands owned by the Licensee for
the purpose of full public utilization of such lands and
waters for navigation and recreational purposes, includ-
ing fishing and hunting, and shall allow to a reasonable
extent for such purposes the construction of access
roads, wharves, landings, and other facilities on its
lands the occupancy of which may in appropriate cir-
cumstances be subject to payment of rent to the Li-
censee in a reasonable amount: *Provided, that* the
Licensee may reserve from public access, such portions
of the project waters, adjacent lands, and project facili-
ties as may be necessary for the protection of life,
health, and property and *Provided, further,* that the
Licensee's consent to the construction of access roads,

wharves, landings, and other facilities shall not, without its express agreement, place upon the Licensee any obligation to construct or maintain such facilities. These facilities are in addition to the facilities that the Licensee may construct and maintain as required by the license.

"*Article 20.* The Licensee shall be responsible for and shall take reasonable measures to prevent soil erosion on lands adjacent to the stream and to prevent stream siltation or pollution resulting from construction, operation or maintenance of the project. The Commission upon request, or upon its own motion, may order the Licensee to construct and maintain such preventive works to accomplish these purposes and to revegetate exposed soil surface as the Commission may find to be necessary after notice and opportunity for hearing."

Moreover, the FPC has adopted administrative regulations which further underline the primacy accorded recreational interests. 18 CFR, Chapter I, Subchapter A, Part 2, § 2.7 declares:

"The Commission expects the licensee to assume the following responsibilities: (a) to acquire in fee and include within the project boundary enough land to assure optimum development of the recreational resources afforded by the project. To the extent consistent with the other objectives of the license, such lands to be acquired in fee for recreational purposes shall include the lands adjacent to the exterior margin of any project reservoir plus all other project lands specified in any approved recreational use plan for the project."

The FPC in Order No. 313 states:

"(C) The Commission will not grant any authorization for a licensee to dispose of any interest in project lands, unless a showing is made that such disposal is not inconsistent with any approved recreational plan or in the absence of such a plan, that the lands do not have recreational value. Pending a determination by the

Commission that such lands are not needed for public recreational purposes, all project lands, buildings or other property will be considered to be required to achieve the purposes of the license within the meaning of any article in the license relating to the leasing of such lands, buildings, or other property. The licensee, in the absence of specific Commission exemption from these requirements, shall include in the instrument of conveyance a covenant running with the land adequate to insure that, unless the Commission subsequently authorizes a different use as consistent with the comprehensive plan for improving or developing the waterway, the use of the lands conveyed will not endanger health, create a nuisance, or otherwise be incompatible with over all project recreational use." 34 FPC 1546, 1549–1550.

Appellees and the Tax Tribunal make a number of arguments concerning the effect of these restrictions on the ad valorem taxable valuation of appellant's uplands.

First, the Tribunal relied on *NeBoShone Association, Inc v State Tax Commission,* 58 Mich App 324; 227 NW2d 358 (1975), in holding that appellant had included within the project boundary more land than required by Commission rules and regulations, specifically FPC Regulation 18 CFR 4.41 *Exhibit K* (1)(iii), which provides:

"Except with respect to lands necessary or appropriate for recreational purposes, for which it is recognized that additional project area will generally be required, the project boundary shall be no more than 200 feet (horizontal measurement) from the exterior margin (in general, highwater level) of reservoirs."

It said that Consumers could not reduce the taxable evaluation of its property by voluntarily submitting it to use restrictions.

*NeBoShone Association, Inc v STC, supra,* is

distinguishable and inapposite. In that case, private landowners banded together to form an association, and agreed that no association member would sell his property without approval by the association. The entire scheme was a virtual conspiracy to avoid property taxes, by placing so many restrictions on property the association members had no intention of selling anyway as to render it without appreciable market value. The present case does not involve restrictions self-imposed by a coalition of private landowners, but instead use limitations imposed by governmental authority, an authority which has jurisdiction to do so and whose actions are controlling by virtue of the supremacy clause of the Federal Constitution.

Noting that FPC rules and regulations provide means by which lands included within project boundaries may be released from license restrictions and sold or leased to third parties, the Tax Tribunal concluded that aside from those 780 acres specifically reserved for recreational uses, the FPC would, upon request, grant such releases. In so holding the Tribunal relied on an exhibit (admitted over Consumers' objection), being a letter from an FPC staff member indicating that the FPC would, in general, consider removing license restrictions on project lands for purposes of sale or lease to third persons, although the staffer declined to render any opinion as to whether amendment of the license would be allowed with respect to any of the lands involved in this project.

Ignoring the hearsay character of the letter, it is clear it added nothing to the case against Consumers. As Consumers acknowledges that FPC rules and regulations allow for license amendments for such purposes, the staff member's letter merely

establishes that the Commission lives by its own rules and regulations.

The issue is not whether the restrictions *could* be lifted by the FPC, but rather *whether* they will be lifted. The only evidence on this point is Consumers' Exhibit Q, copies of every FPC order in a one year period involving land transfer requests by hydroelectric project licensees. Although appellees have argued that the total of 25 cases included in this Exhibit is not a representative sample, and although during the trial counsel for appellees suggested that decisions more favorable to appellees' viewpoint could be found after a short search and if found would be introduced into the record, there is no evidence in the record that the exhibit is unrepresentative and indeed no contrary sample of FPC cases was ever offered or introduced by appellees.

Construed together, the cases included within Exhibit Q permit a number of conclusions: (1) even when transfers are approved, significant easements must be retained by the licensee and significant use restrictions must be placed on the land; (2) or the land must be found to have no recreational value whatsoever. With the exception of a few minor land transfers of not more than an acre or two to persons who were already fee owners of adjacent lands and who required the transfer to make their remaining lands economically accessible, all transferees approved by the FPC were public agencies except for the Veterans of Foreign Wars, which in a single case obtained a 4.5 acre parcel.

In each case, before approving a transfer (and in many of the cases transfers were refused), the FPC first consulted and required approval by state departments of natural resources and water re-

sources commissions, and by the Federal Forest Service, Agriculture Department, National Historical Commission, Interior Department, Fisheries and Wildlife Service, and Corps of Engineers. By no means did the FPC treat a request for the transfer of even less than one acre parcels as a mere formality, but in each case a full investigation was conducted and a formal order entered after due consideration.

The Tax Tribunal made much of the fact that the FPC regulations regarding land transfers require a finding that the land has no recreational value only if there is no approved recreational use plan. That is true; and Consumers has never disputed that the 1,040 acres outside the project boundary could be sold to anyone without prior approval by the FPC. However, lands within the approved recreational use area will not be approved for transfer by the FPC without first amending the license.

It might be argued that of the uplands within the project area, only the 780 acres reserved specifically for recreational uses are subject to these restrictions. But remaining lands were set aside by Consumers as a tree plantation, and only hunting and fishing are allowed. The FPC approved this plan in issuing a license. While a tree plantation is not a recreational use in the sense of a boat dock or park, as a scenic area it has the simple recreational use of natural beauty. The Tax Tribunal ignored the fact that in approving a recreational use plan the FPC must consider scenic beauty and make provisions therefor. *Scenic Hudson Preservation Conference v Federal Power Commission,* 354 F2d 608 (CA 2, 1965), *cert den,* 384 US 941; 86 S Ct 1462; 16 L Ed 2d 540 (1966), *cert den,* 407 US 926; 92 S Ct 2453; 32 L Ed 2d 813 (1972). The

conclusion is inexorable that all the land within the project boundary has been "designated for recreational use".

Appellees rely upon *Georgia Power Co, Project No. 2413,* 42 FPC 356 (1969), where the FPC approved a request that less than 200 feet of land on either side of a reservoir be included within the project boundary, because to include more would be prohibitively expensive given the acreage involved. Although the FPC in an individual case might relax its 200-foot requirement, it has not done so in this case, and its policy is exactly to the contrary. FPC Order No. 313 declares:

"By separate order we are amending Section 4.41 of the regulations to make clear that we expect the licensees to extend their project boundaries beyond the 200 feet from the exterior margin of reservoirs presently specified whenever appropriate to effectuate a comprehensive recreational plan." 34 FPC 1546, 1547 (1965).

Likewise, appellees erroneously rely on *State Highway Commissioner v Eilender,* 362 Mich 697; 108 NW2d 755 (1961), for the proposition that, if there is a reasonable possibility that a government restriction on the use of property will be changed, that possibility must be considered in determining the true cash value of the property. See also Stanley & Tunstall, *State and Local Taxation,* 16 Wayne L Rev 657 (1970).

`The problem is, no "reasonable possibility" has been demonstrated in this case. The evidence is all to the contrary, and accordingly we hold the Tax Tribunal erred in failing to take account of the effect of inclusion of all project uplands within the recreational use plan in determining the value of the property under consideration. *Lochmoor Club v Grosse Pointe Woods,* 3 Mich App 524; 143

NW2d 177 (1966), *Kensington Hills Development Co v Milford Twp & Milford Village,* 10 Mich App 368; 159 NW2d 330 (1968), *Helin v Grosse Pointe Twp,* 329 Mich 396, 407; 45 NW2d 338 (1951).

As to the 2,210 acres of land above the high water mark and within the project boundary, Consumers' ability to realize value from the land through sale or lease is restricted by the terms of the license and applicable statutes and regulations so as to render the market value approach used by the Tax Tribunal completely inapposite. More than a question of mere restrictions on use is involved, as the ability of Consumers to grant permission to third parties to use the land has been severely circumscribed. As to the 780 acres for which actual recreational use leases are in effect or planned, the capitalization method should be the starting point for appraisal. The capitalization method is the most appropriate because the FPC has specifically indicated in the license that leases of the recreational acreage are to be at minimum fees. In light of that restriction, actual income must be considered for determining the value of the land, at least as a starting point, even though this may be less than historical cost, for, although land does not depreciate, its value may be significantly impaired, as in this case, by governmental regulation.

As to those lands constituting the tree plantation, little more than nominal value can be assigned, for neither income nor return of investment can be realized therefrom unless the FPC exercises its takeover rights, in which case it would have to pay historical cost at a maximum. However, if value is assigned to this land based on historical cost, because that is the minimum value an eventual transferee will have to pay, then the

value of the dam itself must be accordingly reduced to account for the takeover possibility, for otherwise the taxing authorities would be reaping the benefits of an inconsistent position on the probability of takeover.

### Uplands outside the project boundary

As to the 1,040 acres outside the project boundary, the Tax Tribunal accorded increased value because of the right of access to Hardy Pond. The record fails to establish that this presumed right of access has any economic value, given the FPC restrictions. Accordingly, that acreage should be valued the same as other land in the area, and ignoring the possibility of access to Hardy Pond or other ephemeral riparian rights.

Accordingly, for the purpose of reappraising the lands in question, except for Parcels BP-357 and 367 and the submerged lands, this matter is remanded to the Tax Tribunal.

### TAX TRIBUNAL'S JURISDICTION TO INCREASE ASSESSMENTS (ISSUE III)

Consumers contends that the Tax Tribunal has no statutory authority or jurisdiction, in a proceeding initiated by a taxpayer seeking a reduction of its assessment, to increase the assessment beyond that determined by the local assessing officer and confirmed by the local board of review, where the alleged under-assessment was first raised by taxing units of government as an affirmative defense in their answer filed as intervening respondents before the Tax Tribunal. As in the case of issues I and II, this issue is better understood in relation to

historical background. The Tax Tribunal was established as the reviewing authority for real property assessment disputes by the Tax Tribunal Act, being 1973 PA 186, which became effective July 1, 1974. MCLA 205.701 *et seq.;* MSA 7.650 (1) *et seq.* Prior to that time, review of contested assessments was governed by certain provisions of the general property tax act. MCLA 211.148 *et seq.;* MSA 7.206 *et seq.* Under that act a taxpayer feeling aggrieved by reason of an alleged over-assessment had two remedies. Under § 152, MCLA 211.152; MSA 7.210, he could appeal to the State Tax Commission (STC); or, alternatively, under § 53, MCLA 211.53; MSA 7.97, he could pay the tax under protest and sue in circuit court. As a practical matter, most contests were brought to the STC which, upon review, had the power to either increase or decrease the assessment. *Fruehauf Trailer Co v Detroit,* 321 Mich 11; 31 NW2d 848 (1948). But under a § 53 appeal, the circuit court was without power to increase the assessment. This dual statutory scheme not infrequently led to decisions by the circuit court which conflicted with those of the STC. As was stated in *Mohawk Data Sciences Corp v Detroit,* 63 Mich App 102; 234 NW2d 420 (1975):

"The Legislature presently provides a taxpayer two methods of challenging the assessment of a personal property tax. First the taxpayer may pay the tax under protest and then sue the township or city in accordance with MCLA 211.53; MSA 7.97, and recover 'if the tax or special assessment is shown to be illegal for the reason shown in such protest'. MCLA 211.53, *supra.*

"The alternative method of attacking a property tax assessment is by seeking administrative review in the State Tax Commission, MCLA 209.101, *et seq.;* MSA 7.631, *et seq.*"

\* \* \*

"[R]eview of a property tax assessment in circuit

court, under § 53, and appeals to the STC are separate and distinct methods of challenging a tax assessment. Both avenues of relief may be pursued simultaneously, see *Moran v Grosse Pointe Twp,* 317 Mich 248, 253; 26 NW2d 763 (1947), and where the STC has made a final decision the subsequent circuit court (§ 53) action is in the nature of a retrial of issues previously decided by the STC. *Cf. Fisher-New Center Co v Detroit,* 38 Mich App 750; 197 NW2d 272 (1972). Therefore, the statutory scheme permits circuit court decisions which conflict with those of the STC." 63 Mich App, *supra,* at 104–106.

However, following enactment and the July 1, 1974, effective date of the Tax Tribunal Act establishing the Tax Tribunal, the Tribunal took over the actions which were theretofore reviewable by the STC or by the circuit court.

It was under § 152 that Consumers sought administrative review by the State Tax Commission (STC) in both 1973 and 1974. In each of those years, the state equalized value as determined by the Supervisor of Big Prairie Township and as approved by the local board of review over protest by Consumers, was $5,669,100. In 1975, the Tax Tribunal Act had taken effect and thus it was that when the dam and lands were again assessed at $5,669,100, Consumers appealed to the Tax Tribunal. And, pursuant to § 71 of the Tax Tribunal Act, MCLA 205.771; MSA 7.650(71), the 1973 and 1974 pending appeals were duly transferred to the Tax Tribunal. Consumers now argues that because the Tax Tribunal Act does not spell out in clear and unequivocal language the power of the Tax Tribunal to increase assessments when acting in its appellate capacity on reviewing contested assessments, it has no power to increase any one of the three-year assessments.[3] Consumers contends

[3] As indicated earlier in this opinion, the Tax Tribunal increased the assessment for 1973 to $8,190,629; the 1974 assessment to $8,483,-

that for the Tax Tribunal to have the same authority to increase assessments as was possessed by the STC, the same must clearly appear from the statute. For the reasons set forth below we totally disagree on this issue of first impression.[4]

To begin with, we do not agree that the Tax Tribunal Act is as restrictive as Consumers contends. To us, § 32 of the statute, MCLA 205.732; MSA 7.650(32), is sufficiently broad and encompassing to grant jurisdiction to either increase or decrease an assessment.

"The tribunal's powers include, but are not limited to:

"(a) Affirming, reversing, *modifying,* or remanding a final decision, finding, ruling, determination, or order of agency.

"(b) Ordering the *payment* or refund of taxes in a matter of which it may acquire jurisdiction.

"(c) *Granting other relief* or issuing writs, orders, or directives which it deems necessary or appropriate in the process of disposition of a matter of which it may acquire jurisdiction." (Emphasis supplied.)

We particularly call attention to subsection 32(b) cited above which empowers the Tribunal to order "the *payment* or refund of taxes". If the Tribunal had no power to increase assessments, it would have been unnecessary for the Legislature to expressly confer upon it the power to order payment. This is so because § 43 of the statute, MCLA 205.743; MSA 7.650(43), then stated: "In the event

---

332, and the 1975 assessment to $9,315,574. This compares with the request of Newaygo County as intervening petitioner to assess at $12,000,000.

[4] Although *Emmet County v State Tax Commission,* 397 Mich 550, 555; 244 NW2d 909 (1976), contains language suggesting that the Tribunal assumed all the powers of decision on tax appeals formerly possessed by the STC, that decision was limited to the power of the Tax Tribunal to equalize.

the date set by law for the payment of taxes has passed, no final decision on the entire proceeding shall be made by the tribunal until the taxes have been paid".[5] In other words, the statute as first enacted did not permit the Tax Tribunal to enter a decision until the taxes in dispute had first been paid. If the taxes have been paid prior to the Tribunal's decision, and if the Tribunal was without authority to increase the assessment, there would be no purpose in the legislative language of § 43 that the Tribunal is empowered to order the payment of taxes.

But, assuming, *arguendo,* that the statute is ambiguous or imprecise as to the Tribunal's power to increase assessments when rendering a final decision, let us turn to legislative intent. We have already noted that under the former procedure the STC was clearly empowered to increase assessments and circuit courts were not. After the Tax Tribunal Act has passed in the Senate and was referred to the House of Representatives, a bill analysis of the proposed House substitute (the same being the bill which was finally adopted) was prepared for legislative guidance by the bill analysis section of the House of Representatives.[6] We quote its pertinent provisions:

*"The Apparent Problem to Which the Bill Addresses Itself:*

"Under the present law, State residents protesting their property taxes or assessments file their initial complaints with the State Tax Commission or, in some cases, with circuit courts.

\* \* \*

---

[5] In 1976, § 43 was amended to permit waiver of payment "at the discretion of the tribunal".

[6] Analysis Section, House of Representatives, Committee: Taxation. Senate Bill 176 (proposed House substitute).

"Some contend tax cases involving similar legal principles and issues are being given contradictory rulings by the various circuit courts around the State. They contend the absence of a lower level State judicial or administrative body capable of setting property tax precedents results in a proliferation of cases being contested, and a waste of time and resources due to redundant contested legal issues.

*"The Manner in Which the Bill Addresses Itself to the Problem:*

"The bill establishes a quasi-judicial agency, known as the Tax Tribunal, *which would assume the State Tax Commission's task* of hearing appeals of property tax determinations. (The Tax Commission would continue to exist and perform its other functions.)

*"Jurisdiction of the Tribunal would include property tax decisions now made by the State Tax Commission,* including direct review of assessment valuation and equalization under property tax laws and proceedings for refunds *or tax redeterminations.* Tribunal decisions would be made by all members, but cases could be heard by one or more members." (Emphasis supplied.)

In determining legislative intent the court may properly refer to the statutes' pre-enactment history as evidenced by extrinsic aids showing the circumstances under which the statute was passed, the mischief at which it was aimed, and the object sought to be achieved. 2A Sutherland Statutory Construction (4th ed), p 191. *Bailey v United States,* 511 F2d 540, 546–548 (Ct of Claims, 1975). The portions italicized in the foregoing bill analysis make it clear that the Legislature intended that the Tax Tribunal would retain all of the jurisdiction formerly exercised over "property tax decisions" made by the STC. Likewise, the cited analysis expresses a legislative recognition of the distinction between refunds (lowering an assessment) and tax redeterminations (increasing an assessment). Our construction of the Tax Tribunal

statute is reinforced by the Supreme Court's decision in *Emmet County v State Tax Commission,* 397 Mich 550; 244 NW2d 909 (1976). The narrow issue presented in that case was whether the STC or the Tax Tribunal had jurisdiction over state (intercounty) equalization. But in the course of holding that such jurisdiction remained with the STC, the Court had occasion to review the legislative intent in creating the Tax Tribunal, saying:

"Section 41 of the same act * * * [Tax Tribunal Act], endows the tribunal with jurisdiction over actions which were heretofore reviewable by the State Tax Commission or by a circuit court.

\* \* \*

"In § 41 of the Tax Tribunal Act, the Legislature made it clear that it was vesting jurisdiction in the Tax Tribunal over 'matters previously heard by the State Tax Commission as an *appellate* body. Formerly, the State Tax Commission was the appellate body over individual assessments, allocation disputes and *intracounty equalization matters.*" 397 Mich, *supra,* at 554–555.

However, Consumers argues that even if the Tax Tribunal had both the power and jurisdiction to increase protested assessments in general, it had no power to do so in this particular case. The claim is multi-faceted. First, it is contended that since the appellee did not ask for an increase in the assessment at the township board of review, appellees are precluded from raising the issue later. The only provision in the Tax Tribunal Act pertaining to the board of review is § 35(1), MCLA 205.735(1); MSA 7.650(35)(1), which mandates that the valuation in question must be protested at the board of review level. This provision was met when Consumers protested at the board of review for each of the three years involved.

Second, it is claimed that the issue of under-assessment was first raised by an intervenor, Newaygo County, who it is claimed had no rights to seek to raise the assessments—at least for 1973 and 1974. We reject this argument by virtue of § 44, MCLA 205.744; MSA 7.650(44), which allows the intervention or impleading by a local governmental unit upon a showing of monetary interest in the proceedings. Obviously, Newaygo County, which levels its county millage on the basis of total county valuation, had a direct monetary interest in the dispute. No time limitations on the date of intervention are set forth in § 44.

Third, it is argued that Consumers is materially prejudiced by lack of notice that some three years later intervenor, Newaygo County, would for the first time raise the question of under-assessment. As Consumers points out, had notice of the under-assessment claim been duly given, Consumers might have elected to pursue its claim for 1973 only. In that event, no forum would exist for Newaygo County to raise the issue for 1974 and 1975. In equitable respects Consumers' argument has merit. Realistically, it may well not have appealed in 1974 or 1975 had it believed a local governmental unit would raise the claim of under-assessment. Even more realistically, the probabilities of a determination of under-assessment by the Tax Tribunal would be less had no one appeared in the 1973 appeal to champion such cause. Nevertheless, from a statutory and strictly legal point of view, the potential for a finding of under-assessment came into being the instant Consumers took its § 152 appeal to the Tax Tribunal. From that moment on, the Tax Tribunal had the jurisdiction and power to increase the contested assessment even if no one had appeared in opposition. *Frue-*

*hauf Trailer Co, supra.* Under § 37(1), MCLA 205.737; MSA 7.650(37), the Tax Tribunal is mandated to find "true cash value".[7] To us, this means full cash value, as determined by whichever of the five methods of valuation heretofore discussed, is most appropriate. Since this Court cannot assume that the Tax Tribunal would not have followed the statutory mandate, even if the intervenor had not raised the issue, we find no prejudice to plaintiff.

Finally, Consumers argues that a "new" issue was raised and further that it was raised by an intervenor who, according to established rules of pleading and practice governing intervention, may not broaden the issues subject to litigation between the principal parties. The answer to this argument is that the issue of under-assessment was not new. From the time that appeal was taken to the Tax Tribunal, the issue was "true cash value". Determination of "true cash value" and in turn "lawful property assessment" was the statutorily prescribed duty of the Tax Tribunal. In effect Consumers' argument amounts to a claim that the Tax Tribunal might legally determine something less than true cash value. Clearly that is not the law. Clearly, also, the question of potential under-assessment was implicit from the beginning. *Fisher-New Center Co v Detroit,* 38 Mich App 750; 197 NW2d 272 (1972), is inapplicable.[8]

---

[7] "In arriving at its determination of a lawful property assessment, the tribunal shall determine the amount by multiplying its finding of true cash value by a percentage equal to the ratio of the average level of assessment in relation to true cash values in the assessment district."

[8] Plaintiff cites *Fisher, supra,* as holding that the taxing authority may not use the Tax Tribunal as a forum to raise the question of under-assessment. But in *Fisher,* the taxing authority having first lost in a § 152 determination by the then STC sought to raise the issue all over again in a § 53 circuit court suit brought by the taxpayer. The Court held that a § 53 action was a remedy solely granted to the taxpayer.

Affirmed in part, reversed in part and remanded to the Tax Tribunal in accordance with this opinion. No costs, neither party having prevailed in full.