THRIFTY ROYAL OAK, INC v CITY OF ROYAL OAK

Docket No. 59034. Submitted January 4, 1983, at Lansing.—Decided
November 7, 1983. Leave to appeal applied for.

Thrifty Royal Oak, Inc., an affiliated real estate company con-
trolled by Meijer, Inc., built a retail shopping center of 247,000
square feet for Meijer, Inc., on a 27-acre site in Royal Oak. The
site for the shopping center is leased from Oak Construction
Company for $85,000 per year. The lease between Thrifty Royal
Oak, Inc., and Meijer, Inc., provides for an annual rent of
$1,100,000 plus the $85,000 cost of the lease of the land. The
shopping center and its associated land were assessed by the
City of Royal Oak for the years 1978, 1979, and 1980 at
$6,238,000, $6,312,000, and $6,706,000, respectively. Thrifty
Royal Oak, Inc., and Meijer, Inc., petitioned for review of those
assessments in the Tax Tribunal. The School District of the
City of Royal Oak sought to intervene in the Tax Tribunal
proceedings. The Tax Tribunal denied the motion to intervene
on the basis that the school district's interests were adequately
represented by the City of Royal Oak. The Tax Tribunal denied
a rehearing on the basis that the school district had nothing
more than a monetary interest in the proceedings. Petitioners
alleged that, although the shopping center had just been built,
it was poorly located and was losing more money than would be
expected from a new operation and, accordingly, the value of
the shopping center was less than the replacement or recon-
struction cost. Petitioners presented the testimony of two ap-
praisers as to the true cash value of the property. Donald

REFERENCES FOR POINTS IN HEADNOTES
[1] 72 Am Jur 2d, State and Local Taxation § 787.
[2, 3] 72 Am Jur 2d, State and Local Taxation § 759.
  Sale price of real property as evidence in determining value for tax
  assessment purposes. 89 ALR3d 1126.
[4, 5, 8] 72 Am Jur 2d, State and Local Taxation §§ 765, 766.
[6, 10, 12] 72 Am Jur 2d, State and Local Taxation § 1142.
[7] 5 Am Jur 2d, Appeal and Error § 831.
  81 Am Jur 2d, Witensses § 656.
[9] 72 Am Jur 2d, State and Local Taxation § 856 *et seq.*
[11] 73 Am Jur 2d, Statutes § 721.

Hartman determined that the highest and best use of the property was as industrial property and, using an income approach, opined that the true cash values for the years in question should be $3,488,000, $3,432,000, and $3,441,000. Eldon Nedeau testified that the best use would be as commercial property and, using an income approach, opined that the true cash values for the years in question should be $3,256,000, $3,540,500, and $3,904,500. The appraiser for the City of Royal Oak, Leo Goldstein, concluded that the best use of the property was as commercial property and that the annual rent of $1,185,000 paid by Meijer, Inc., to Thrifty Royal Oak, Inc., was, when adjusted for certain expenses, comparable to other commercial leases on a per square foot basis. Using a capitalization of income approach, Goldstein opined that the true cash values for the years in question should be $11,235,000, $11,413,000, and $11,413,000. Using a market approach, Goldstein opined that the true cash values for the years in question should be $11,200,000, $11,400,000 and $11,400,000. Using a reproduction cost approach, Goldstein opined that the true cash values for the years in question should be $8,358,000, $9,075,000, and $10,047,000.

The Tax Tribunal determined that the best use was as commercial property and that the comparables used by the appraisers for both petitioners and respondent were not truly comparable because they involved retailing operations that were significantly different in either size or operation from the business conducted on the subject property. The Tax Tribunal held the subject property to be unique, used a reproduction cost approach, and determined the true cash values to be $8,300,000, $8,900,000, and $9,700,000 for tax years 1978, 1979, and 1980, respectively. Petitioners appeal. The Royal Oak School District cross-appeals. The Court of Appeals added the Oakland County treasurer as a party. *Held:*

1. Findings of fact by the Tax Tribunal, including findings as to the credibility of witnesses, are binding on the Court of Appeals if supported by competent, material, and substantial evidence.

2. Since the parties failed to present any evidence of sales of property which were truly comparable both in terms of size and use to the subject property and since the use of the "hybrid" comparables used by the parties to calculate the true cash value by the income and market approaches would lead to unreliable results, the Tax Tribunal did not err in treating the subject property as unique and in using the replacement cost method to determine the true cash value of the property.

3. Since a tax is not delinquent until it has been levied and

since a tax may not be spread and levied during the pendency of proceedings relative to the propriety of the assessment of the property, interest on the taxes levied following the resolution of an assessment dispute shall be at the rate of 6% rather than at the 12% rate contained in the statutory provision relating to delinquent taxes.

4. Intervention of a school district in the proceedings before the Tax Tribunal is not a matter of right, but rather is a matter addressed to the discretion of the Tax Tribunal. The Tax Tribunal did not abuse its discretion in denying the school district's motion to intervene.

Affirmed.

ALLEN, J., affirming in part and reversing in part, held that the Tax Tribunal erred in treating the subject property as unique and adopted a wrong principle by using the replacement cost approach to determine the true cash value. He would hold that neither the petitioners nor the respondent carried its burden of proof that the original valuations of the city should be increased or decreased and that the original valuations should be affirmed. He would hold that the question of the intervention of the school district was a matter addressed to the discretion of the Tax Tribunal and the Tax Tribunal did not abuse its discretion in denying the school district's motion to intervene.

BRONSON, J., affirming in part and reversing in part, would hold that the Tax Tribunal properly used the replacement cost approach and found the true cash values to be $8,300,000, $8,900,000, and $9,700,000 for the years 1978, 1979, and 1980, respectively. He would hold that the Tax Tribunal properly imposed interest at the rate of six percent, since the taxes were not delinquent during the pendency of the proceedings on the question of the propriety of the assessed valuation. He would hold that intervention of the school district was a matter of right in that the application to intervene was timely, the representation by the city was not sufficient to protect the interests of the school district, the school district would be bound by any determination entered by the Tax Tribunal and the school district had no other forum in which to seek review of the propriety of the assessment.

WAHLS, J., for affirmance, agreed with Judge BRONSON that the Tax Tribunal did not adopt any wrong principles of valuation in fixing the assessments by the reproduction cost method and properly imposed interest at the rate of six percent, but agreed with Judge ALLEN that intervention of the school dis-

trict was a matter addressed to the discretion of the Tax Tribunal and the Tax Tribunal did not abuse that discretion by denying intervention by the school district.

OPINION OF ALLEN, P.J.

1. TAXATION — TAX TRIBUNAL — APPEAL.

    *Appellate review of decisions of the Tax Tribunal, in the absence of an allegation of fraud, is limited to the question of whether the tribunal committed an error of law or adopted a wrong principle.*

2. WORDS AND PHRASES — TRUE CASH VALUE — FAIR MARKET VALUE.

    *The concepts of "true cash value" and "fair market value" in Michigan are synonymous.*

3. TAXATION — PROPERTY TAXES — FAIR MARKET VALUE — TRUE CASH VALUE — TAX TRIBUNAL.

    *Any method of calculating true cash value of property that is recognized as accurate and is reasonably related to fair market value is an acceptable indicator of true cash value; it is the duty of the Tax Tribunal to select the method which, under the facts, is most accurate.*

4. TAXATION — PROPERTY TAXES — TRUE CASH VALUE — UNIQUE PROPERTY — TAX TRIBUNAL.

    *It is error for the Tax Tribunal, upon a determination that a piece of property is unique, to determine the true cash value by the reproduction cost method without first determining whether the unique features of the property would affect the property's fair market value.*

5. TAXATION — PROPERTY TAXES — TRUE CASH VALUE — UNIQUE PROPERTY — REPRODUCTION COST.

    *Property is not properly treated for the purpose of determining the true cash value for ad valorum tax purposes as being so unique as to require the use of the reproduction cost approach where the property, while being adapted to the owner's particular needs, could be converted at minimal cost to other business or industrial uses.*

6. TAXATION — TAX TRIBUNAL — INTERVENTION.

    Intervention by a government unit in an appeal of a property tax assessment to the Tax Tribunal is not a matter of right but is rather a matter addressed to the discretion of the Tax Tribunal; it is not an abuse of discretion for the Tax Tribunal to

deny intervention of a school district in an appeal of a property tax assessment where the interests of the school district are adequately represented by another governmental unit which is a party to the appeal and the school district has no interest other than a monetary interest (MCL 205.744; MSA 7.650[44]).

OPINION OF BRONSON, J.

7. TAXATION — TAX TRIBUNAL — FINDINGS OF FACT — APPEAL.

Findings of fact by the Tax Tribunal, including findings as to the credibility of witnesses, are binding on the Court of Appeals if supported by competent, material and substantial evidence.

8. TAXATION — PROPERTY TAXES — TRUE CASH VALUE — UNIQUE PROPERTY — REPLACEMENT COST — TAX TRIBUNAL.

It is proper for the Tax Tribunal to treat a piece of real property as "unique" and use the replacement cost method of determining the fair market value where the parties fail to present any evidence of sales of property which were comparable in terms of size and use and the use of "hybrid comparables" to calculate the value by the market and income approaches would lead to unreliable results.

9. TAXATION — PROPERTY TAXES — INTEREST.

Interest on taxes levied following the resolution of proceedings to review the assessment of real property are at the rate of six percent, since, until the review process relative to the assessment is complete, the taxes cannot be levied and, accordingly, the taxes do not remain unpaid and delinquent within the meaning of the statutory provision which provides that interest on delinquent taxes shall be at the rate of 12% (MCL 205.737[4], 211.59; MSA 7.650[37][4], 7.103).

10. TAXATION — TAX TRIBUNAL — INTERVENTION — SCHOOL DISTRICTS.

Intervention by a school district in an appeal in the Tax Tribunal of a property tax assessment involving property located within the school district is a matter of right if the school district seeks such intervention in a timely fashion (MCL 205.744; MSA 7.650[44]).

11. STATUTES — INTERVENTION — JUDICIAL CONSTRUCTION.

Statutes relative to the intervention of parties in proceedings are remedial in nature and, therefore, should be liberally construed.

12. Taxation — Tax Tribunal — Intervention — School Districts — Court Rules.

*There are adequate safeguards to prevent any unnecessary grant of intervention by a school district in an appeal of a property tax assessment in the Tax Tribunal if intervention is held to be a matter of right; the General Court Rules provide that intervention is proper only where there is a timely application for intervention, there is a showing that the proposed intervenor's interest is not adequately represented by the existing parties and there is a showing that the proposed intervenor may be bound by any judgment entered in the proceedings (GCR 1963, 209.1[3]).*

*Miller, Johnson, Snell & Cummiskey* (by *Jon G. March, Eric J. Thorsen* and *Robert J. Christians*), for Thrifty Royal Oak, Inc., and Meijer, Inc.

*Teresa E. Schafer*, City Attorney for the City of Royal Oak.

*Shifman & Goodman, P.C.* (by *Burton R. Shifman* and *John A. Carlson*), for the School District of the City of Royal Oak.

Before: Allen, P.J., and Bronson and Wahls, JJ.

Allen, P.J. Petitioners appeal by right a judgment of the Michigan Tax Tribunal entered May 19, 1981, establishing the real property valuations and assessments of a Meijer Thrifty Acres discount store and related buildings in the City of Royal Oak for the tax years 1978, 1979, and 1980. Respondent intervenor, School District of the City of Royal Oak, cross-appeals from the Tax Tribunal's denial of the school district's motion to intervene.

The true cash value of the properties at issue had been established by the City of Royal Oak at $6,238,000 for 1978, $6,312,000 for 1979, and $6,706,000 for 1980. The assessed value of the

properties was set at 50% of the thus-established true cash values. Believing that the valuations established by the city were too high, petitioners appealed to the Tax Tribunal, which, following extensive hearings, not only rejected petitioners' claim that the valuations were too high, but increased the true cash values as follows:

|      | True Cash Value | Increase over City Valuation |
|------|-----------------|------------------------------|
| 1978 | $8,300,000      | $2,062,000 (33%)             |
| 1979 | $8,900,000      | $2,588,000 (41%)             |
| 1980 | $9,700,000      | $2,944,000 (44%)             |

Assessments were established at 50% of the Tax Tribunal's determinations of true cash value.

The property consists of a 27-acre site on which sits a retail shopping center building with an area of some 247,000 square feet. The store building is operated by petitioner Meijer, Inc., the parent company. Thrifty Royal Oak, Inc., is an affiliated real estate company controlled by Meijer, Inc., and organized to finance the Royal Oak development. Thrifty Royal Oak leases the store and underlying land to Meijer, Inc., for a basic rental of $275,000 quarterly ($1,100,000 annually) and additional rental of 1.25% on all gross sales in excess of the basic rental. It is unlikely the additional rental will be triggered in the near future. The basic rental exceeds the amount necessary to amortize the loan on the building by $232,000 each year. The excess is used for internal purposes unrelated to the property. According to petitioners, the Meijer organization *as a whole* received credit financing, as opposed to mortgage financing, for $8,050,-000 at 9.375% interest over a 25-year period, on the strength of Meijer's credit and not on the

security of the property being purchased. The lease between Thrifty Royal Oak, Inc., and Meijer, Inc., was, however, made part of the financing document, thus serving as a guarantee of repayment. Respondent disagreed that the property was superfluous as collateral and pointed to an "Indenture of Mortgage and Deed of Trust between Thrifty Royal Oak, Inc., and Michigan National Bank as Trustee" which reserved to the trustees security in the improvements themselves and the lease on the improvements.

Respondent argues that this indenture bound Meijer, Inc., to remain as a tenant until 1988 unless Meijer, Inc., substituted a fee simple or leasehold estate in other property of fair market value at least equal to the outstanding balance of the loan or with lease rental at least equal to that of the lease and terminating no earlier than December 31, 1999. After January 1, 1988, Meijer, Inc., could cancel the lease and pay off the balance of the loan. Finally, the underlying land is owned by an unaffiliated corporation, Oak Construction Company, which leased the property to a Meijer, Inc., subsidiary (Applewood Company), which in turn assigned the lease to Thrifty Royal Oak, Inc. Under the terms of this lease, Thrifty Royal Oak, Inc., pays $85,000 in annual rent for a lease term of 25 years.

Thrifty Royal Oak, Inc., also has an option to purchase the land for $900,000 between June 1984 and 1989. Under the terms of the lease between Oak Construction and Applewood Company, the property may be used for specified commercial uses and "any other lawful commercial purpose". The owner of Oak Construction Company stated that he did not interpret this lease to prohibit an industrial use provided that use was "lawful".

Meijer, Inc., pays Thrifty Royal Oak, Inc., the $85,000 annually in addition to the building "rental" of $1,100,000 per year. According to petitioners, no effort was made to determine fair market rent, and Thrifty Royal Oak, Inc., would never sell the property to an unrelated party with the lease still in effect while Meijer, Inc., continues its retail operations on the premises.

Fred Meijer, Chairman of the Board of Meijer, Inc., testified that the Meijer organization had erred in choosing this site, especially for so large a store. The location has proven to be accessible only with difficulty from several directions and was completely inaccessible from one direction. Traffic flow in the area is poor, and the lack of other retailers in the area means fewer customers are attracted to the store. Consequently, this Meijer store has had to use "extraordinary sales incentives", and spend a great amount of money (4% to 6% of its sales versus 1.5% of sales at other Meijer's stores) for advertising to generate sales. Despite these expenditures, petitioners claim that the store has lost over $5,100,000 before taxes in its first 2-1/2 years of operation and is doing "very much worse" than other Meijer's stores did during their two-year "start-up" period. These figures were the same ones used by the Meijer organization in evaluating its 27 stores and deciding whether to continue a store's operation. Meijer's will continue to absorb these losses until it must "give up hope that [Meijer's] can make it" at the Royal Oak location. Mr. Meijer stated that, if sales losses continued at the 1980 rate, Meijer's would have to close this store and sell the building, although he knew of no other single retailer who would be in the market for a store this large in the Detroit area.

From the foregoing, it is not at all surprising that the appraisers for petitioners, Donald Hartman and Eldon Nedeau, and the appraiser for the City of Royal Oak, Leo Goldstein, reached widely disparate true cash values for the property.

| TAX YEAR | PETITIONERS' APPRAISERS HARTMAN/NEDEAU | RESPONDENT'S ORIGINAL TCV | RESPONDENT'S APPRAISER GOLDSTEIN |
|---|---|---|---|
| 1978 | $3,488,000/$3,256,500 | $6,238,000 | $11,200,000 |
| 1979 | $3,432,000/$3,540,500 | $6,312,000 | $11,400,000 |
| 1980 | $3,441,000/$3,904,500 | $6,706,000 | $11,400,000 |

Hartman testified that, because the property was in an industrial neighborhood, its highest and best use would be industrial. Using an income approach (supported by a market sale approach), he arrived at the true cash value determination set forth above. In addition, assuming a continued commercial retail use and using comparable sales of five other large discount stores, he found the market value of the property to be significantly lower if the property were put to commercial use rather than industrial use.

Nedeau, unlike Hartman, felt that the highest and best use of the property was commercial. Relying primarily on an income approach, he determined the true cash value to be substantially less than either the reproduction cost or the replacement cost.

Goldstein concluded that, even though the surrounding area was industrial, the highest and best use of the property was commercial. Using the Meijer, Inc.,—Thrifty Royal Oak, Inc., lease as the basis for his income approach, Goldstein divided the annual rent of $1,185,000 by the gross leasable area and determined that the rental rate under the lease was $5.06 per square foot per year. He

then compared this rental with that of five other new commercial complexes with either a Kroger or K-Mart store as a primary tenant within two to three miles of petitioners' store. From this comparison and from the cost of the property, he concluded petitioners' $1,185,000 lease rental was a fair market rental. The lease rental was reduced to $1,141,300 because the lessors of the comparables were responsible for certain expenses, thus reducing the rent to $4.87 per square foot of gross leasable area. The net income was then capitalized at an overall rate of 10%. Goldstein's estimates of value under the income approach were:

| 12/31/77 | 12/31/78 | 12/31/79 |
|---|---|---|
| $11,235,000 | $11,413,000 | $11,413,000 |

These figures were closely mirrored by Goldstein's market approach. In both approaches, Goldstein used shopping center comparables of admittedly significantly smaller size and somewhat better locations for commercial purposes.

Goldstein also appraised the property by the reproduction cost approach (the cost of replacing the property with an exact duplicate). The final true cash value contentions (including land) under this approach were:

| 12/31/77 | 12/31/78 | 12/31/79 |
|---|---|---|
| $8,358,000 | $9,075,000 | $10,047,000 |

Goldstein considered this approach the least reliable of the three approaches because he felt an investor would pay more for the "finished package" than it would cost to reproduce it. This assumption was again premised on the continued existence and effect of the Meijer, Inc.,—Thrifty Royal Oak, Inc., lease.

On cross-examination, Goldstein stated that petitioners' site was not a prime commercial site, that he had appraised the property in the belief that the sales at the store were very good and without knowledge that petitioners' sales volume was "purchased", that he might not have adjusted his comparison of sales between K mart stores and petitioners' store to account for Meijer's sales of gasoline, prescription drugs, and groceries, that he had not considered the fact that $230,000 of Meijer's $1,185,000 per year "rent" was not related to rent on the property, and that he had not considered petitioners' $5,000,000 plus losses in doing his appraisal because he felt these losses "could be" normal start-up losses at a new store.

In a carefully prepared and detailed written opinion comprising some 20 pages, the three member panel of the Tax Tribunal reviewed the testimony presented. Under the heading "Conclusions of Law", the Tax Tribunal found "little credibility to the testimony of petitioner's appraiser Hartman", and likewise concluded that "appraiser Nedeau's analysis of value via the income approach is not satisfactorily supported by the evidence". The opinion goes on to state that, while Goldstein's testimony overall was "more persuasive" than that of the petitioners' appraisers, the tribunal was "unable to accept his valuations in their entirety". The tribunal also faulted Goldstein for finding that the true cash value was some $3,000,000 more than what the proofs indicated the facility could have been reproduced or replaced for.

Having faulted all of the testimony to some degree, the tribunal opinion concluded as follows:

"The tribunal determines the market data and income approaches to be the least reliable indicators of value in the instant case, *in light of the proofs pre-*

*sented.* Because neither party was able to present to the tribunal evidence of sales of properties comparable to subject in size and use, or evidence of rental properties of like comparability, they formulated hybrid estimates of value combining data taken from community shopping centers and/or relating to tenants such as Kroger or K-Mart which do not combine, under a single roof, all phases of petitioner's operation.

"The subject property appears to have been improved in a manner uniquely suited to the company's special-type business. Consistent with *First Federal Savings & Loan Ass'n of Flint v City of Flint* [104 Mich App 609; 305 NW2d 553 (1981)], the tribunal concludes that the cost approach provides the best indication of value in this case.

## Summary of Cost Approach

*"12/31/77*

| | |
|---|---|
| Replacement Cost New | $7,095,078 |
| Depreciation 4% | 283,803 |
| Depreciated Value Improvements | $6,811,275 |
| Estimated Land Value | 1,466,000 |
| | $8,277,275 |
| Rounded to | $8,300,000 |

*"12/31/78*

| | |
|---|---|
| Replacement Cost New | $8,007,627 |
| Depreciation 8% | 640,610 |
| Depreciated Value Improvements | $7,367,017 |
| Estimated Land Value | 1,525,000 |
| | $8,892,017 |
| Rounded to | $8,900,000 |

*"12/31/79*

| | |
|---|---|
| Replacement Cost New | $9,321,642 |
| Depreciation 12% | 1,118,597 |
| Depreciated Value Improvements | $8,203,045 |
| Estimated Land Value | 1,525,000 |
| | $9,728,045 |
| Rounded to | $9,700,000 |

"It is hereby ordered and adjudged that the following values are determined to be the true case values for Petitioner's property for the years in dispute and, applying the level of assessment for each year, the revised assessments are as follows:

| Year | True Cash Value | Level | Revised Assessment |
|------|-----------------|-------|--------------------|
| 1978 | $8,300,000 | 50% | $4,150,000 |
| 1979 | $8,900,000 | 50% | $4,450,000 |
| 1980 | $9,700,000 | 50% | $4,850,000" |

(Footnotes omitted; emphasis in original.)

On appeal, petitioners' brief raises six grounds for reversal.[1] Of the six issues, I find the threshold issue of whether the Tax Tribunal adopted the wrong principle of valuation in using reproduction cost to be controlling. If the answer to that question be "yes", then petitioners' remaining issues need not be addressed. But in order to answer that question, it is necessary to first determine *the reason* the tribunal came to use reproduction cost. Much of the debate on appeal revolves about the conflicting interpretations given by the parties for the tribunal's use of reproduction cost.

Respondent city argues that the tribunal started by using Goldstein's market or income approach but then shifted to reproduction cost when the income approach indicated a value exceeding reproduction cost. Under this interpretation, reproduction cost was a "substitution" used as a cap to limit true cash value. On the other hand, petitioners contend that the tribunal, feeling uncomfortable with Goldstein's comparables, rejected the in-

---

[1] Two additional issues raised in the cross-appeal of the School District of the City of Royal Oak, relating to intervention, will be addressed later in this opinion.

come or market approach and determined that petitioners' store was a special use property which under established case law may be valued under the reproduction cost approach.

While the question is not without its ambiguity, I agree with petitioners' interpretation. Contrary to the city's assertion, "substitution" was not introduced to limit the already accepted market and income approaches, but instead was another reason for rejecting Goldstein's market and income approaches, as is evidenced in the tribunal's opinion:

"Further, appraiser Goldstein's cost approach, which estimated values of $8,358,000 (12/31/77), $9,075,000 (12/31/78), and $10,047,000 (12/31/79), reflected sums substantially lower than his correlated conclusions of value of $11,200,000-$11,400,000, in contradiction of a basic appraisal principle per *Appraisal of Real Estate,* 7th ed, pp 263, 264 * * *."

Petitioners also are correct in their contention that the tribunal determined that petitioners' store was a special-use property and, therefore, should be valued by the cost approach:

"The subject property appears to have been improved in a manner uniquely suited to the company's special-type business. Consistent with *First Federal Savings & Loan Ass'n of Flint v City of Flint,* * * * the tribunal concludes that the cost approach provides the best indication of value in this case."

Based upon a fair reading of the tribunal's opinion, I conclude that the tribunal rejected all of the approaches used by petitioners' appraisers and

the market data and income approaches preferred by respondent's appraiser because the underlying statistical claims had not been sufficiently proven. In addition, because the tribunal was not satisfied that community shopping centers with Kroger and K-Mart stores were comparable to petitioners' multi-phased operation contained in one large store, the tribunal concluded that petitioners' property had been "improved in a manner uniquely suited to [petitioners'] special type business".

Having concluded that the tribunal, in fact, did find that the store was a special-type business which, consistent with this Court's opinion in *First Federal Savings & Loan,* 104 Mich App 609; 305 NW2d 553 (1981), was best valued by the cost approach, I turn to the question of whether the tribunal committed an error of law or adopted a wrong principle. Where no fraud is alleged, the Court's review is limited to questions of whether the tribunal committed an error of law or adopted a wrong principle. *Northwood Apartments v Royal Oak,* 98 Mich App 721, 724; 296 NW2d 639 (1980); *Consolidated Aluminum Corp, Inc v Richmond Twp,* 88 Mich App 229, 231; 276 NW2d 566 (1979).

For the purposes of taxation, property is assessed in accordance with its true cash value. True cash value is defined as the "usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price which could be obtained for the property in private sales". MCL 211.27; MSA 7.27. The concept of true cash value is synonymous with fair market value. *CAF Investment Co v State Tax Comm,* 392 Mich 442, 450; 221 NW2d 588 (1974). Any method for determining true cash value which is recognized as accurate and reasonably related to fair market value is an acceptable indicator of true

cash value. *Safran Printing Co v Detroit,* 88 Mich App 376, 380; 276 NW2d 602 (1979). It is the duty of the Tax Tribunal to select the method which, under the facts, is most accurate. *Ramblewood Associates v City of Wyoming,* 82 Mich App 342, 345-347; 266 NW2d 817 (1978).

The tribunal relied heavily on this Court's decision in *First Federal* as justification for using a value in use (limited by reproduction cost) approach. The problem is that on December 23, 1982, the Supreme Court reversed this Court, *First Federal Savings & Loan Ass'n of Flint v City of Flint,* 415 Mich 702, 706-707; 329 NW2d 755 (1982):

"Rather, we reject the notion that it is proper to include, in determining value, expenditures made, as the Tax Tribunal found, to enhance plaintiff's image and business *without regard to whether they add to the selling price of the building.*

"Absent more persuasive evidence, such as comparable sales, historical cost or reproduction cost can be considered in arriving at the usual selling price, but historical or reproduction cost that merely enhances image or business but not selling price is not subject to taxation." (Emphasis supplied.)

At no point did the tribunal attempt to determine whether the property's unique features would affect the market value of the store. Contrary to the city's assertion, the tribunal did not casually or incidentally refer to this Court's decision in *First Federal.* To the contrary, the language of the tribunal's opinion was the fulcrum on which the tribunal posited its cost approach.

Furthermore, I disagree with the tribunal that the property was "unique". The features upon which the tribunal relied in finding that the store was unique were the store's large size and its

incorporation of both grocery and general merchandise sales under one roof. The appraisers, including Leo Goldstein, all testified that the store could be subdivided and sold either to petitioners' competitors or as industrial property. Finally, not one witness even suggested the property was unique, and two of the appraisers testified that, in their opinion, the building was both too ordinary a retail store and too flexible a building to be considered unique. The property could be adapted to other uses with the expenditure of only a modest amount of money.

In *Matter of Great Atlantic & Pacific Tea Co, Inc v Kiernan,* 42 NY2d 236; 366 NE2d 808 (1977), almost identical testimony caused the New York Court of Appeals to reject valuing the subject property ("one of the world's largest food processing plants") as unique. The plant had been designed for the plaintiffs to accommodate its food processing, warehousing, and shipping operations and contained 73 truck loading docks, interior railroad sidings, laboratories, offices, and cold storage and refrigeration facilities. The court concluded that, although the plant was built to serve the particular purposes of the plaintiff's business, the building was "easily convertible to other industrial uses" and could readily be subdivided into smaller units without heavy expenditures.

From these findings, the New York Court of Appeals distinguished the plant from "unique" property:

"While various definitions have been advanced, a specialty may perhaps be best defined as a structure which is *uniquely* adapted to the business conducted upon it or use made of it *and* cannot be converted to other uses without the expenditure of substantial sums of money. Property has been categorized as a specialty

where some intangible element such as the owner's prestige or good will inheres in its value.

"On the other hand, property does not qualify as a specialty where it possesses certain features which, while rendering the property suitable to the owner's use, are not truly unique to his business but, in fact, make the property adaptable for general industrial use. Thus, if no great expense would be entailed in converting the property from the present owner's use to other business and industrial uses and if a market value may be ascertained, property should not be valued as a specialty merely because it contains such features as interior railroad sidings, truck loading docks or other amenities and fixtures which are not truly unique to the owner's business." (Citations omitted.) 42 NY2d 241-242.

In conclusion, the New York Court of Appeals held that the plant should be valued by the market data approach.

In summary: my answer is "yes" to the threshold question of whether the tribunal adopted the wrong principle of valuation. The judgment of the Tax Tribunal establishing true cash values and revised assessments for the three tax years in question should be vacated and set aside. However, I agree with the tribunal that petitioners have not carried the burden of proof that the valuations made by the city should be decreased. In view of the proofs presented and the Supreme Court's decision in *First Federal*, I am not persuaded that the valuations established by the city should either be decreased (as requested by petitioners), or increased (as determined by the Tax Tribunal).

Though the matter becomes somewhat academic in view of my decision on the main issue, I now address the claim of the School District of the City of Royal Oak that the tribunal erred in not allowing its intervention in the proceedings before the

tribunal. The claim is two-pronged: (1) intervention under MCL 205.744; MSA 7.650(44) is of right whenever the school district seeks to intervene before the hearing and decision of the Tax Tribunal, and (2) if intervention is discretionary, the tribunal abused its discretion. I disagree.

*Northwood Apts, supra,* a case involving the same school district and the same counsel as here, refutes the first claim.

"The respondent School District contends that the Tax Tribunal erred in denying its motion to intervene. It is contended that the motion should have been *granted as of right* and, in the alternative, that the Tribunal abused its discretion in denying the motion.

"MCL 205.744; MSA 7.650(44), provides in relevant part:

" '* * * the tax tribunal may permit the intervention or impleading of any governmental unit which receives tax funds from the petitioner who is making the appeal.'

"Unless other considerations compel a contrary conclusion, the use of the word 'may' indicates that the statute is discretionary. *Law Dep't Employees Union v City of Flint,* 64 Mich App 359, 368; 235 NW2d 783 (1975). Respondent having failed to cite to this Court any 'other considerations' which compel a contrary conclusion, we hold that the statutory language does not create an absolute right to intervene on the part of the School District.

"No time limitations on the date of intervention are set forth in MCL 205.744; MSA 7.650(44). See *Consumers Power Co, supra,* 159. However, an intervenor must be diligent, and any unreasonable delay after knowledge of the action will justify a denial of intervention where no satisfactory excuse is shown for the delay. *School Dist of City of Ferndale v Royal Oak Twp School Dist No 8,* 293 Mich 1, 10-11; 291 NW 199 (1940)." (Emphasis supplied.) 98 Mich App 729.

Petitioners clearly are correct in arguing this

Court held both that intervention is discretionary and that there was no abuse of discretion in that case because the school district attempted to intervene late.

MCL 205.744; MSA 7.650(44) states:

"(1) *Except for petitions filed under chapter 6, the tax tribunal may permit the intervention or impleading of any governmental unit which receives tax funds from the petitioner who is making the appeal.*

"(2) *If a petition is filed under chapter 6,* the tribunal may permit the intervention or impleading of a state or local governmental unit or officer thereof or of any person or other entity upon a showing of a material monetary interest in the decision of the tribunal which is not likely to be adequately presented by the parties to the proceeding." (Emphasis added.)

The first section was added by amendment in 1976.

In denying the school district's original motion to intervene, the tribunal stated that the district had not shown that its interests would not be adequately represented by respondent, City of Royal Oak. In denying the school district's subsequent motion for rehearing, the tribunal stated that the district had alleged "nothing more than a monetary interest in the proceedings". The school district now argues that both these grounds were inappropriate grounds for denial because the Legislature has eliminated the first as a grounds for denial and made the second ground the very reason a school district should be permitted to intervene.

The school district incorrectly interprets the impact of the 1976 amendment. Instead of forbidding the denial of intervention for the school district because of adequate representation by another party, the Legislature merely made it sim-

pler for the tribunal to grant intervention, even though adequate representation existed, if the tribunal so desired. In this case, the tribunal did not so desire. This was especially true because the school district, in addition to being adequately represented by the city, alleged no interest, other than a monetary interest, in the decision of the tribunal. While the tribunal is not *required* to deny intervention on this second ground, it still may do so under these circumstances.

I would reverse in part and affirm in part. I would award no costs, public questions being involved.

Bronson, J. The primary issue before this Court is whether the Tax Tribunal's decision is supported by competent, material, and substantial evidence on the whole record. *Fisher New Center Co v State Tax Comm,* 381 Mich 713, 715; 167 NW2d 263 (1969). I believe that the tribunal's decision must be affirmed because the values indicated by expert witness Leo Goldstein's appraisal, as limited by a reproduction cost approach to value, constitued competent, material and substantial evidence of the determined value. I also believe that there was an ample basis for the tribunal's decision to reject the alternative appraisals submitted by petitioners' experts, Donald Hartman and Eldon Nedeau.

The tribunal found Goldstein's testimony to have been "more persuasive overall" than that of petitioners' experts. The tribunal's finding with respect to credibility of witnesses is a factual finding which binds the present Court on review. *Consolidated Aluminum Corp v Richmond Twp,* 88 Mich App 229; 276 NW2d 566 (1979). There are only two ways in which petitioners challenge Goldstein's appraisal.

First, they dismiss his appraisal as invalid by noting the tribunal's "serious doubt" as to the "arm's length nature" of the underlying lease between Thrifty Royal Oak, Inc., and the parent company, Meijer, Inc. Arguably, as petitioners contend, certain terms and conditions of the lease may have been formulated so as to accomplish what petitioners characterize as "intra-company" objectives. However, Goldstein did testify that, despite the relationship between the Meijer-affiliated parties to the lease, the rental figure did reflect a fair equivalent of market conditions. As noted above, the tribunal has the prerogative of determining the credibility of witnesses.

The tribunal's statement that the lease was not an arm's-length transaction does not translate into a conclusion that the rental amount inherent in the lease was anything other than a market rent. On the contrary, the tribunal's opinion indicates that its sole purpose in describing the lease as a non-arm's-length transaction was to distinguish the case of *CAF Investment Co v Saginaw Twp*, 410 Mich 428; 302 NW2d 164 (1981):

"The proofs cast serious doubt upon the arm's length nature of the subject long-term lease * * *. The conclusion that the subject lease was not an arm's-length transaction for assessment purposes eliminates the necessity of attempting to apply to the instant case the rationale of the Supreme Court's majority in *CAF Investment Co v Saginaw Twp* [citation omitted] and, in the process, arrive at a finding of true cash value within the realm of reason and supported by the evidence. Indeed, were the tribunal to conclude that subject lease was arm's length in nature and necessary of consideration herein, the actual net income * * * would produce an excessive value estimate not justified by the proofs."

It is apparent that the tribunal's reference to the lease as a non-arm's-length transaction did not in any way invalidate its reliance upon Goldstein's appraisal testimony.

Petitioners' second and more basic challenge to the use of Goldstein's appraisal testimony concerns the fact that, using a market approach to valuation, Goldstein's value estimate was about $3,000,-000 more than the reproduction cost of the property. Petitioners contend that the tribunal erred as a matter of law when it resolved this discrepancy by applying the principle of substitution, whereby appraised market value would have an upper limit not exceeding reproduction costs plus land value. However, petitioners fail to demonstrate the inappropriateness of applying this principle, nor do they suggest any reason why the tribunal might have erred in using a cost approach *for the sole purpose of setting an upper limit* on value otherwise indicated by Goldstein's market approach.

In arguing against the tribunal's use of a cost approach, petitioners focus exclusively upon the fact that the tribunal's opinion characterized the property as "unique", and the fact that the tribunal cited this Court's opinion in *First Federal Savings & Loan Ass'n of Flint v City of Flint,* 104 Mich App 609; 305 NW2d 553 (1981), *rev'd* 415 Mich 702; 329 NW2d 755 (1982), as authority for use of a cost approach. I believe that the tribunal acted properly in characterizing the property as "unique", and disagree with Judge Allen's suggestion that the citation of this Court's opinion in *First Federal, supra,* necessarily renders invalid the tribunal's use of a cost approach.

The tribunal's conclusion that the property is "unique" flows directly from the nature of evidence adduced at the hearings below. Neither

party presented any evidence of sales of properties which were comparable in size or use. Instead, the parties relied upon "hybrid" estimates of value which combined elements of community shopping centers on the one hand, and smaller individual stores on the other. It is clear from the record that each party's "comparables" attributed a distorted market value to the subject property—those used by petitioners' appraisers understated cash value, while those used by Goldstein resulted in valuations which exceeded replacement costs of the building. Given the parties' complete inability to produce relevant "comparables", the tribunal acted properly in characterizing the subject property as unique "in light of the proofs presented".[1]

The question remains whether the tribunal's citation to this Court's opinion in *First Federal, supra,* was sufficient to invalidate the tribunal's use of a cost approach in this case. For several reasons, I believe that the reference to *First Federal* was not reversible error. First, as noted above, the lack of any reliable "comparables" was by itself sufficient to demonstrate the unique character of the property and, in turn, to justify resort to a cost approach to valuation. In *Consumers Power Co v Big Prairie Twp,* 81 Mich App 120, 130; 265 NW2d 182 (1981), this Court observed:

"The choice of which method [of valuation] to use is

---

[1] Arguably, this Court could remand for clarification of the tribunal's opinion—specifically, to confirm that the tribunal's characterization of the property as "unique", and its consequent use of a cost approach, was in fact based upon the parties' failure to produce adequate substantiation of their proposed valuations using a market or income approach. However, remand for this purpose is unnecessary, because the tribunal's opinion makes it clear that this was the reason for its treatment of the property as "unique".

The tribunal specifically stated that the market and income approaches were unreliable, and a cost approach necessary, "in light of the proofs presented".

by no means unfettered; it is the duty of the Tax Tribunal to adopt that method which is most appropriate to the individual case as the particular facts may indicate."

In the Supreme Court's opinion in *First Federal,* so heavily relied upon by petitioners and Judge ALLEN, the Court actually applied this principle in a manner which favors respondent's position in this case. The Court noted that, in cases where the parties fail to present other persuasive evidence of valuation, it may be not only proper but desirable to consider evidence of cost:

"*Absent more persuasive evidence, such as comparable sales, historical cost or reproduction cost can be considered in arriving at the usual selling price,* but historical or reproduction cost that merely enhances image or business but not selling price is not subject to taxation." 415 Mich 706-707. (Emphasis added.)

It is apparent that, under the circumstances, the tribunal's decision to consider cost data was consistent with, rather than contrary to, principles underlying the Supreme Court opinion in *First Federal.*

The Supreme Court did not reverse this Court's decision in *First Federal* solely because the tribunal had found the property in that case unique and had considered reproduction cost as evidence of value. Instead, the reason for reversal was that the tribunal's decision in that case contravened the principle announced in the nonemphasized portion of the sentence quoted above. Specifically, the Court observed:

"The Tax Tribunal erred in adopting the hearing officer's reasoning that the value should include amounts expended for physical improvements that the

hearing officer found were made to enhance the bank's 'image' or 'business' without regard to whether the expenditures added to the 'cash' or 'usual selling price' of the property." 415 Mich 705.

The foregoing reveals a crucial distinction between the present case and *First Federal, supra.* Here, petitioners have not shown that the tribunal has improperly relied upon any evidence of reproduction cost which "merely enhances image". In fact, petitioners do not challenge the validity of the particular cost figures used by the tribunal— their primary argument is that the tribunal erred in considering evidence of cost at all. Since the reason for reversal in *First Federal* was not the mere finding of uniqueness, or even the tribunal's use of a cost approach but, rather, the use of flawed cost data, petitioners' failure to identify comparably flawed data in the present case goes a long way toward distinguishing *First Federal.*

Another important factor distinguishing *First Federal* is the result which flowed from the tribunal's application of a cost approach. In *First Federal,* the use of a cost approach had the effect of raising assessed value above that dictated by the more conventional market or income approaches. Contrast the present case where cost data was used to limit the value which would have resulted from adoption of Goldstein's market-based appraisal, which the tribunal found credible.

In short, the present case does not present the problems encountered in *First Federal:* reliance upon elements of cost which (1) "merely enhance image" and (2) raise, rather than limit, the assessment that would otherwise have been reached using a more conventional approach to valuation. Accordingly, the mere fact that the tribunal cited *First Federal* in support of its use of a cost ap-

proach does not compel the conclusion that it has repeated the error which required reversal in that case.

I believe that the tribunal acted properly in rejecting the appraisals submitted by petitioners' experts. First, the tribunal properly rejected the experts' claim that the subject property was functionally and economically obsolescent within months of its opening. It is true that the tribunal relied to a significant extent upon gross sales per square foot in rejecting the claim of obsolescence. However, this was neither surprising nor improper given that petitioners had based their claim of obsolescence on a showing that the store was "unprofitable" because sales were unusually low by industry standards.

In rejecting the claim of obsolescence, the tribunal found that the subject store was performing significantly better than other Meijer stores and far better than other community stores and discount outlets. This finding was in turn based upon figures contained in Exhibit R-8, an exhibit whose admission into evidence remains unchallenged on appeal. The tribunal did not improperly rely upon any exhibit which was not in evidence.[2]

Similarly, in rejecting the claim of obsolescence, the tribunal did not err in failing to adjust comparable sales figures for petitioners' sales of gasoline and food. Even after the adjustments proposed by petitioners, the gross sales of merchandise per square foot compared satisfactorily, if not favorably, with that of other discount stores. The tribu-

[2] Exhibits which have been admitted into evidence, such as Exhibit R-8 here, may be distinguished from documents which have not been admitted into evidence, but upon which the tribunal has nonetheless either expressly or implicitly relied. See *Clark Equipment Co v Leoni Twp,* 113 Mich App 778, 787; 318 NW2d 586 (1982). Since the exhibit was admitted into evidence, its contents could properly be cited in support of the tribunal's decision to reject the claim of obsolescence.

nal was not required to derive a precise formulation of petitioners' gross sales. The sole purpose for using these figures was to review the claim that the subject property was obsolescent, because of either its size or location. Given that, even after any proposed adjustments, sales at the subject store compared satisfactorily with other discount stores, and given further the witness's agreement that during the period in question the subject store was still in a "start up" period, following which sales would normally be expected to grow to even higher levels, I believe that the evidence did in fact support the tribunal's decision to reject the claim of obsolescence. Accordingly, the tribunal acted properly in rejecting the appraisals of petitioners' experts, which presupposed such obsolescence.[3]

The remaining issues raised by petitioners on

---

[3] In support of their claim of obsolescence, the petitioners quote the Supreme Court's opinion in *First Federal, supra,* to the effect that "[a] building is sometimes worth less the day after completion of construction than its cost of construction". 415 Mich 705. However, this observation has little to do with situations such as the present one, in which a private enterprise, guided by the profit motive and unaffected by considerations of social policy, has seen fit to build a commercial structure on the taxed property. The Court in *First Federal* made clear the context of the above-quoted observation: "Ordinarily overimprovements are built by government, not by private entrepreneurs who, in theory at least, would not construct an improvement unless they thought it was worth at least what it cost to build." 415 Mich 705-706. The Court in *First Federal* did note that in certain instances, a private enterprise such as a bank may construct "overimprovements" which are designed solely to "enhance * * * image"; similarly, the Court gave the example of a private homeowner who adds "a greenhouse, a gazebo, a tennis court * * * a hot tub" or some other structure which reflects the homeowner's personal tastes or interests and which may be worth less than the cost of its construction. 415 Mich 706. None of the examples cited in *First Federal* are apposite here, since, as noted above, petitioners have completely failed to identify features of the subject property which may have been constructed solely "to enhance image", to fulfill a social policy, to gratify the owner's personal tastes, or to otherwise accomplish noncommercial objectives. In short, *First Federal, supra,* provides no support for petitioners' claim of obsolescence.

appeal are without merit. All of these issues involve factual determinations which are beyond this Court's purview. The tribunal did not err in refusing to consider petitioners' Exhibit 33 showing the assessed true cash values of other Meijer stores and K mart stores. Cross-examination of the witness who prepared the exhibit, Charles Payton, revealed that there was no way to determine the means of assessment on any of the comparison stores. Furthermore, it was impossible to determine the extent to which principles of depreciation had been applied to the other stores, so that any comparison of cash values would be meaningless. Since petitioners concede that the sole purpose of the exhibit was to show that the market value of the comparison stores equaled their assessed true cash value, the uncertainties inherent in those comparison values were in and of themselves sufficient to justify the tribunal's refusal to consider them. Accordingly, the tribunal acted properly in refusing to give weight to the exhibit whose sole purpose was to set forth those values.

There was no error in the tribunal's decision to reject witness Donald Hartman's industrial appraisal of the property. The tribunal found as a factual matter that the other witnesses, Goldstein and Nedeau, had correctly identified the property's highest and best use as commercial, rather than industrial. This was the basis for its decision to reject Hartman's industrial appraisal; the presence of zoning and ground lease restrictions which might have precluded industrial use was only a nominal factor in the tribunal's decision to reject this appraisal. The factual determination underlying the tribunal's treatment of this appraisal—that the property's highest and best use is commercial—is a finding which a reviewing court may

not overturn on appeal, *Consolidated Aluminum, supra.*

The tribunal also did not err in rejecting Hartman's supplemental "commercial use" appraisal. Petitioners' assertions to the contrary, the tribunal did not just rely upon its finding that the five comparable sales underlying that appraisal were "salvage" or "forced" sales of bankrupt discount stores. The tribunal pointed to other factors which rendered Hartman's comparables unreliable, *e.g.:* (1) the fact that the "comparables" were "significantly (55% to 75%) smaller than [the] subject [property]", and (2) the deteriorated and abandoned condition of the buildings on the "comparable" properties, which contrasted sharply with the new building and viable business located on the subject property. In short, the evidence of record amply supports the tribunal's disposition of the issues raised by petitioners on appeal. Petitioners' claims of error are primarily factual in nature and, as such, are beyond the purview of this Court. I believe that the tribunal's determination of true cash value should be affirmed.

The final issue involved in the appeal concerns the rate at which interest has accrued on the additional portion of petitioners' taxes, first assessed in the tribunal's 1981 judgment. The opinion sets a rate of six percent, as required under MCL 205.737(4); MSA 7.650 (37)(4). However, respondent urges that interest should accrue at the higher, 12% rate set forth in MCL 211.59; MSA 7.103, a provision which governs collection of delinquent taxes.

Nothing in the record supports respondent's assumption that petitioners have been "delinquent" in their payment of taxes on the subject property. Under MCL 205.755; MSA 7.650(55),

once petitioners filed an appeal, the due date for collection was deferred pending final disposition of the matter appealed. Petitioners correctly point out that taxes cannot be delinquent until they have been lawfully placed upon the tax rolls and remain unpaid, the taxes may not be placed on the rolls until their legality has been established, and the legality of the assessment, in turn, cannot be accomplished until all appeals, including the present one to this Court, have been resolved. In the present case, the legality of the assessment and the tribunal's methods of deriving that assessment remain disputed through the present appeal. Accordingly, there can be no basis for applying a statute which presupposes a taxpayer's delinquent status.

Respondents do not point to any alternative basis for imposing a 12% rate of interest on the unpaid amount in question. Accordingly, there is no basis for this Court to disturb the tribunal's decision to impose interest at the rate of six percent.

In conclusion, I believe that the tribunal's decision must be affirmed with respect to both the principal amount assessed and the amount of interest imposed.

Lastly, I cannot concur with the disposition by Judge ALLEN and Judge WAHLS relative to the issue raised in respondent intervenor's cross-appeal, namely, whether the tribunal erred in denying its motion to intervene. Specifically, I disagree that a school district whose budget may be profoundly affected by the outcome of a tax dispute may be denied intervention where the request to intervene is timely made.

Judge ALLEN's opinion relies exclusively on *Northwood Apartments v Royal Oak,* 98 Mich App

721, 729; 296 NW2d 639 (1980), in which a panel of this Court held that MCL 205.744; MSA 7.650(44) "does not create an absolute right to intervene on the part of the school district". However, the situation in *Northwood Apartments, supra,* differed sharply from that of the present case. There, the school district had not applied for intervention until well after the hearing and issuance of the tribunal's decision. Under the circumstances, it is hardly surprising that the panel found no "absolute right" to intervene. Contrast the present case where the school district filed its motion to intervene in 1978, long before the hearing date. To the extent that the decision in *Northwood Apartments* was based upon the school district's tardiness in filing for intervention, it should be limited to its facts. At the very least, the result of that case is neither apposite nor binding here, because the school district's motion here was by all means timely.

Petitioners point to certain language in *Northwood Apartments* which suggests that intervention under MCL 205.744; MSA 7.650(44) is discretionary rather than mandatory:

"The respondent School District contends that the Tax Tribunal erred in denying its motion to intervene. It is contended that the motion should have been granted as of right and, in the alternative, that the Tribunal abused its discretion in denying the motion.

"MCL 205.744; MSA 7.650(44), provides in relevant part:

" '* * * the tax tribunal may permit the intervention or impleading of any governmental unit which receives tax funds from the petitioner who is making the appeal.'

"Unless other considerations compel a contrary conclusion, the use of the word 'may' indicates that the statute is discretionary. *Law Dep't Employees Union v*

*City of Flint,* 64 Mich App 359, 368; 235 NW2d 783 (1975). Respondent having failed to cite to this Court any 'other considerations' which compel a contrary conclusion, we hold that the statutory language does not create an absolute right to intervene on the part of the School District.

"No time limitations on the date of intervention are set forth in MCL 205.744; MSA 7.650(44). See *Consumers Power Co, supra,* 159. However, an intervenor must be diligent, and any unreasonable delay after knowledge of the action will justify a denial of intervention where no satisfactory excuse is shown for the delay. *School Dist of City of Ferndale v Royal Oak Twp School Dist No 8,* 293 Mich 1, 10-11; 291 NW 199 (1940)." 98 Mich App 729.

Petitioners' assertions to the contrary, the foregoing quotation is consistent with either of two propositions which favor the school district's position: (1) that intervention may still be as of right when timely requested, or (2) that intervention is discretionary, but that under certain circumstances, such as those of the present case, it is an abuse of discretion to deny a timely filed request to intervene. I believe that the decision in *Northwood Apartments* may reasonably be construed as having left the door open to intervention as of right.

The Court in *Northwood Apartments* had no choice but to reject the school district's proposed mandatory construction of the statute because the school district in that case had failed to cite any "considerations" which might weigh in favor of such a construction. 98 Mich App 729. In the present case, the school district has taken the step of identifying certain crucial policy considerations which strongly support, if not compel, a construction allowing for intervention as of right.

First, many school districts do not receive state

school aid adjustments corresponding to tax revenue short-falls and, therefore, may find that in certain major tax disputes a significant percentage of their budget is at stake. It is apparent that, in many cases, the school district affiliated with the taxing authority has an acute interest in the outcome of certain assessment proceedings. For example, in the present case, it is undisputed that the school district has far more tax dollars at stake than does the respondent, City of Royal Oak. This is a phenomenon which is hardly unique: in most communities, a school district's tax rate is substantially higher than that of the related city or township. I find it highly inequitable that the party with the greatest amount at stake in such appeals would, under the majority's proposed rule, have no opportunity to even help finance the defense, let along have a voice in the proceedings.

Second, a consideration which weighs in favor of intervention by right is the fact that the school district has no alternative remedy for an adverse result in an assessment appeal to the tribunal. There can be no question that the school district will be bound by any judgment issued by the Tax Tribunal. Still, there is no forum other than the Tax Tribunal in which a school district would be able to express its views on matters at issue before the tribunal.

Third, failure to allow intervention as of right would contravene the expressed intention of the Legislature. In 1976, MCL 205.744; MSA 7.650(44) was amended to allow for liberalized intervention. By adding subsection (1), the Legislature expressed its intention of allowing school districts to represent their own interest when the school district has some motive to participate—a motive which the Legislature framed in terms of protecting the

tax revenues which sustain the district's opera-
tions. The amendment immediately followed issu-
ance of an opinion of the Attorney General, OAG,
1975-1976, No 4963, p 375 (April 8, 1976), holding
that a school district may not even contribute
financially to a city's defense of an assessment
appeal unless the district is a party to that appeal.
The amendment appears to have been a reaction
to that opinion and manifests an intention to
liberalize the rules of intervention so as to allow
school districts to more readily defend their vital
interests. Given this legislative history, together
with the fact that intervention statutes are reme-
dial in nature and should therefore be liberally
construed, *School Dist of City of Ferndale v Royal
Oak Twp School Dist No 8,* 293 Mich 1, 9; 291 NW
199 (1940); *D'Agostini v Roseville,* 396 Mich 185,
189; 240 NW2d 252 (1976), I believe that the
tribunal should have resolved any ambiguity in
the statute and the *Northwood Apartments* deci-
sion in favor of intervention by right.

There is one additional factor which weighs in
favor of intervention by right. Standards for dis-
cretionary intervention are impossible to discern
either from the face of the statute or from any of
the cases decided under it. The absence of such
standards would inevitably result in serious incon-
sistencies, if not grave inequities, in school dis-
tricts' access to tribunal proceedings.

Even in the present case, the tribunal's criteria
for denying "discretionary" intervention were
vague and amorphous. The original, October 10,
1978, order denying intervention was based on the
school district's supposed failure to show that its
interests would not be adequately represented by
the City of Royal Oak. On rehearing, the tribunal
changed its criterion and found intervention un-

necessary because the school district had alleged "nothing more than a monetary interest in the proceeding". This latter criterion is particularly puzzling, since the sole interest of any party to litigation (other than actions for injunctive or declaratory relief) is compensation—inevitably expressed in terms of a monetary award or judgment. In tax cases such as the present one, the monetary award is designated as tax revenue, but it is of no less "interest" to the school district dependent upon such revenue than an arbitration award or jury verdict is to an aggrieved litigant in a non-tax case. The fact that the tribunal resorted to the use of this vague, undefined criterion of "interest in the case" shows how free-wheeling and capricious the petitioners' proposed "discretionary" intervention standard would be.

Manageable standards governing intervention by right may be found in GCR 1963, 209.1(3), a rule which contains provisions sufficient to safeguard against any unnecessary grant of intervention. The rule provides three prerequisites to intervention by right: (1) timely application, (2) a showing that the proposed intervenor's interest is not adequately represented by existing parties, and (3) a showing that the proposed intervenor "may" be bound by judgment in the proceedings. These standards may reasonably be read into MCL 205.744; MSA 7.650(44), as construed by *Northwood Apartments, supra.* In that case, the school district failed to meet the first requirement and thus was properly denied intervention by right. Contrast the present case where it is undisputed that the first and third requirements have been fulfilled (the third requirement is fulfilled because the school district's revenues will definitely be affected by the outcome of the tribunal proceedings), yet the dis-

trict will have no forum for appealing that outcome.

The only question in the present case was whether the school district had met the second requirement, showing that its interests were not adequately represented by the city. It was this criterion which the tribunal initially relied upon in denying intervention, although its finding as to this issue was conclusory and has never been satisfactorily explained. The fact that the tribunal even referred to this criterion shows that, in essence, it was applying the court rule's standards governing intervention by right; there was no need to resort to any theory that the intervention issue was a matter of "discretion".[4]

I believe that this Court should clarify the status of school districts and their right to intervention in the Tax Tribunal proceedings. Adoption of the standards set forth in GCR 1963, 209.1(3), either by analogy or by implication as elements of the right of intervention guaranteed by MCL 205.744; MSA 7.650(44), would go a long way toward eliminating the uncertainties which surround this issue.

I would reverse that aspect of the tribunal's decision which denied the school district's motion to intervene and would hold that, under the circumstances presented, the school district would have been entitled to intervene as a matter of right, provided it could show that its interests

[4] Petitioners and the majority emphasize that the statute uses the term "may" instead of the more traditional mandatory language, "shall". However, the Supreme Court has repeatedly observed that the term "may" can be construed as a mandatory expression, *Brooke v Brooke,* 272 Mich 627; 262 NW 426 (1935); *Smith v School Dist No 6,* 241 Mich 366; 217 NW 15 (1928), particularly where a public interest—such as preservation of a governmental unit's opportunity to protect tax revenues—is concerned, *Smith v City Comm of Grand Rapids,* 281 Mich 235, 243; 274 NW 776 (1937).

were not adequately represented by the city.[5] There is no need to address the school district's alternative contention that the tribunal abused its discretion in denying intervention.

WAHLS, J. I agree with Judge BRONSON that the tribunal's decision with respect to both the principal amount assessed and the amount of interest imposed must be affirmed. In my opinion, the tribunal did not adopt wrong principles of valuation.

However, I am unable to agree with Judge BRONSON that the tribunal erred in denying intervention. I agree with Judge ALLEN that intervention is discretionary and that there was no abuse of discretion.

I would affirm the judgment of the Tax Tribunal.

[5] If the issue of intervention had not been rendered "academic" by disposition of the main appeal, I would remand for further hearings on the issue of whether the school district's interests were adequately represented by the city. In making this determination, I would instruct the tribunal to use standards adopted in opinions decided under GCR 1963, 209.1(3).